NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0129n.06

No. 09-4120

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Feb 28, 2011**
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| HUA TU LIN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW FROM A |
| | ) | FINAL ORDER OF THE BOARD OF |
| ERIC HOLDER, JR., United States | ) | IMMIGRATION APPEALS, |
| Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |

Before: SILER, CLAY, and GIBBONS, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Petitioner-appellant Hua Tu Lin ("Lin")

appeals a final order of the Board of Immigration Appeals ("BIA"), adopting in part the reasoning

of the Immigration Judge ("IJ"), to remove him from the United States and to deny his application

for asylum, withholding of removal, and protection under the both the Immigration and Nationality

Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and the Convention Against Torture ("CAT"), 18 U.S.C. §

2340 *et seq.* Lin claims that substantial evidence does not support the denial of his claims. For the

following reasons, we affirm the decision of the BIA, denying Lin's application for asylum.

I.

Lin is a national of the People's Republic of China ("China"). In May 2006, Lin left China

and traveled to Malaysia in order to obtain a Taiwanese passport. He returned to China a week later

-1-

before flying to Russia, Holland, Guatemala, and Mexico. From Mexico, Lin entered the United States without inspection near Hidalgo, Texas, in July 2006. Border patrol officials apprehended Lin shortly thereafter and charged him with removability under 8 U.S.C. § 1182(a)(6)(A)(i), on the grounds that he was neither admitted nor paroled into the United States. In August 2006, Lin admitted the allegations and conceded removability. He moved to Cleveland, Ohio, in August 2006.

In November 2006, Lin filed an application for asylum and for withholding of removal on the basis of religion, political opinion, and membership in a particular social group. Lin claimed he had "suffered mistreatment and persecution by the Chinese Government because [he is] a Christian" and that he would be punished if he returned to China both because of his faith and because he left China illegally. Specifically, Lin testified that he and his family had previously attended "service and gathering" and "Sunday Mass" in the home of their "preacher[], Father Nie" in the town of Min Ching. Because Nie's gathering was not a registered church, Lin claimed, the Chinese government had investigated the group and detained some members, sending them to the Public Security Bureau for Ideology Re-education sessions. Lin's family left Min Ching shortly after the investigations and moved to Lianjiang County, where they began to attend a government-registered church without incident. Lin, however, returned to Min Ching for high school. Lin claimed to have stayed with Father Nie and taken a more active role in Nie's church as Nie's "assistant."

Nie also claimed to have started a student group in high school dedicated to Bible study. The group was not registered as required, and when the school authorities discovered the group, Lin was expelled. After the expulsion, Lin eventually left Min Ching and moved back to live with his family, but he would periodically return to Father Nie's church. Lin alleged that the Chinese government

again detained members of Nie's church in December 2005, this time as they attended Christmas Mass. Lin claimed he escaped the police officers and went into hiding for six months. He also claimed to have learned from his parents that they had received a detention order for Lin from the Police Security Bureau and that police officers had come to his parents' home to arrest him. Lin said in his application that the police wanted him based on his assistance to Father Nie and efforts to "rally students in school for [an] anti-Government campaign." Based on these events, Lin left for the United States as soon as his father could make arrangements.

On November 14, 2007, Lin testified at a hearing pursuant to the removal proceeding. He largely retold the same story he had written in his 2006 application, though there were some discrepancies between the two accounts. Lin, for instance, testified in the immigration court that his family had not received a written report from the Chinese authorities that were supposedly looking to detain him. At court, he called his religious leader in China "Pastor Nie," rather than "Father Nie" as he had in the written application. When asked about the circumstances of his expulsion from high school, Lin at times asserted that he had been expelled because he violated the school's policy forbidding secret clubs, not because the club he had formed was involved in Christian studies. Lin also testified he was born in 1985, despite his birth certificate saying that he was born in 1988; he could not explain the discrepancy.

Lin also provided more details about his account. He testified that the first government interruption at Nie's house was in the spring of 1998. Neither he nor his family had been harmed during that first intervention, and they had returned home the same evening. During the alleged government persecution at Father Nie's house in December 2005, Lin explained that he "managed

to escape through the back door" and thereby avoid the authorities. He also testified that his family now lives in Lianjiang and continues to attend the government-registered church without incident. And when asked about his traveling to the United States, Lin admitted he did not seek asylum in any of the four countries through which he traveled.

Lin also provided details about developments since he arrived to the United States. He asserted that he began practicing as a Jehovah's Witness in December 2006. He also testified that were he returned to China, he would continue to practice as a Jehovah's Witness—his current religion—and would "spread the gospel," which he believed would cause him to be reported to the government and "attacked . . . severely." On cross-examination, however, Lin could not explain certain foundational facts about Jehovah's Witnesses, such as what a "pioneer" and a "kingdom hall" were, or what the names of the different stages of the ministry are. Lin also incorrectly answered some questions regarding more fundamental Christian tenets; Lin, for instance, testified that Jesus is referred to by name and appears in the Old Testament.

After the November hearing, the IJ denied Lin's applications for relief and withholding of removal pursuant to § 241(b)(3) and the CAT. The IJ first found Lin not to be a credible witness, both because his testimony was "not consistent with his written application" in places and because he "did not appear to answer all questions sincerely, and forthrightly, and truthfully." The IJ noted the "vague generalities" of Lin's testimony about Christianity, comprising mostly "broad references to the Bible, and the gospel" without further explication of his faith. Similarly, the IJ noted Lin's failure to explain in any detail what precise restrictions the government had placed on his religious practice, given the ability of his parents to practice Christianity at a registered church. While the IJ

opined that he did "not expect the respondent to provide a detailed theology . . . [Lin] should explain something about the specific beliefs that he claims to hold and which he says have and will cause him trouble in China."

The IJ also highlighted the inconsistencies between Lin's oral testimony and the supporting documentation submitted by Lin. The opinion emphasized the discrepancy over the existence of a written detention order his family supposedly received from the police. The IJ also noted that none of the supporting affidavits from Lin's family corroborated his testimony about the police having physically visited his family to look for Lin. As to Lin's testimony about his religious practices in China, the IJ noted that Lin did not describe himself as Father Nie's assistant during his oral testimony before the IJ as he had in his written application and was inconsistent as to whether Nie was referred to as "Father Nie" or "Pastor Nie."

Second, the IJ found that Lin had not met his burden of proof that he suffered past persecution in China. Even accepting Lin's account that he was "held for a few hours on one occasion," the IJ noted that Lin himself acknowledged he had not suffered abuse or physical mistreatment. Lin's ability to worship at his parent's registered church, moreover, undermined his claim that he was persecuted, and because Lin could not specify what precise religious freedoms he had been denied by the Chinese government, the IJ concluded his case for past persecution was unpersuasive.

Third, the IJ found that Lin had not demonstrated a well-founded fear of future persecution should he return to China. Because the IJ concluded there was no showing of past persecution, the IJ did not presume future persecution was likely: "There is simply no proof other than the

respondent's own words that the government of China is interested in him today or would wish to persecute him." The IJ reiterated Lin's imprecision with respect to the religious ideas that endangered him. Similarly, the IJ emphasized the lack of support to Lin's claim that Chinese authorities were actively searching for him. Even accepting the documentation of general religious intolerance in China, the IJ concluded that there was no evidence to support the argument that Lin had an objectively reasonable fear of persecution on account of his religion.

Lin appealed the IJ's decision to the BIA, specifically challenging the IJ's adverse credibility determination and the rulings that Lin had failed to carry his burden as to either past persecution or future persecution. The BIA dismissed the appeal in August 2009. The BIA found that the IJ did not clearly err in finding Lin non-credible, given the inconsistencies in the record about Lin's age and the circumstances of his expulsion from high school, as well as the vagueness of Lin's testimony about his religious beliefs. Alternatively, the BIA affirmed the IJ's determination that, even if Lin was found credible, he failed to meet his burden to establish his eligibility for relief. Like the IJ, the BIA noted the lack of documentation supporting Lin's claim that Chinese authorities were searching for him, undermining his claim of an objectively reasonable fear of future persecution. Lin timely petitioned this court for review following the dismissal.

II.

This court has jurisdiction to review the BIA's order pursuant to 8 U.S.C. § 1252(a)(1). Where, as here, the BIA does not summarily affirm the IJ's decision, but reviews the IJ's decision and issues a separate opinion, this court reviews the BIA's decision as the final agency determination. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). Lin argues that it is only proper

for this court to review the BIA's decision and not the underlying opinion of the IJ. This circuit's precedent, however, firmly establishes that "[t]o the extent that the BIA adopted the [IJ's] reasoning,[] this Court also reviews the [IJ's] decision." *Id.* Here, all of the BIA's conclusions are framed as reviews of the IJ's opinion, rather than as a direct review of the administrative record itself. By casting its own opinion as a review of the IJ's findings, the BIA implicitly adopts substantial portions of the IJ's opinion; we therefore review the IJ's reasoning in addition to the BIA's decision.

Relevant administrative factual findings are reviewed under the deferential substantial evidence standard. The BIA's factual findings (including those adopted from the IJ's decision) must be upheld if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (internal quotation marks omitted)). Under this standard, findings of fact by the BIA and the IJ are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary. 8 U.S.C. § 1252(b)(4)(B). This court may not reverse simply on the grounds that it would have decided the matter differently or that the evidence supports a contrary conclusion. *Koliada v. INS*, 259 F.3d 482, 486 (6th Cir. 2001). To reverse, the evidence must "not only support[] a contrary conclusion, but indeed *compel*[] it." *Id.* (internal quotation marks omitted).

III.

Lin makes four separate but related substantive challenges to the BIA's decision. We review each of these in turn.

A.

Lin first argues that there is insufficient evidence to support the BIA's adverse credibility determination. Credibility determinations are governed by the new standard adopted by Congress in the REAL ID Act of 2005, which applies to Lin's application because it was filed after May 11, 2005. *Yacoub v. Holder*, 337 F. App'x 511, 514 (6th Cir. 2009). The relevant statutory passage provides:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii).

Both the IJ and BIA based their conclusions about Lin's credibility on (1) inconsistencies between Lin's testimony and other documentation and (2) the "vague generalities" within parts of Lin's testimony about his religious practice and persecution, which the IJ attributed to Lin's failure "to answer all questions sincerely, and forthrightly, and truthfully." Both of these findings are relevant to the credibility determination under § 1158(b)(1)(B)(iii). The consistency of an applicant's account is an explicit metric to be used in order to measure credibility; greater specificity in one's testimony corresponds to greater candor and responsiveness, in addition to being permitted for consideration under the "any other relevant factor" catch-all. § 1158(b)(1)(B)(iii).

-8-

The finding that Lin's testimony was inconsistent is supported at multiple points in the record. The record reveals a discrepancy over whether Lin's family ever received a written detention order from the police. When asked about the circumstances of his expulsion from high school, Lin at times asserted that he had been expelled because he violated the school's policy forbidding secret clubs, not because the club he had formed was involved in Christian studies. In addition, Lin testified he was born in 1985, despite his birth certificate saying that he was born in 1988; he could not explain the discrepancy.

Similarly, the record supports a finding that Lin was not forthright and candid during the application process. The IJ rightly noted that Lin never explained what precise restrictions the government placed on his religious practice, given the ability of his parents to practice Christianity at a registered church. This failure to highlight his fear of persecution dovetails with Lin's very opaque description of his own religious beliefs, which never became more specific than general references to the Bible and his desire to "spread the gospel."[1] Lin also never offered any concrete testimony about the government authorities that were searching for him when he fled China in 2006, other than to say that they had visited his parents. For these reasons, the record amply supports the BIA's conclusion that Lin was not a credible witness, and we affirm the finding.

---

[1] Lin rightly notes that "[m]any deeply religious people know very little about the origins, doctrines, or even observances of their faith." *Iao v. Gonzalez*, 400 F.3d 530, 534 (7th Cir. 2005). The issue here, however, is not whether Lin is in fact religious, but whether his testimony by itself is credible or requires corroborating evidence to support his application. The depth of Lin's religious knowledge has probative value as to establishing credibility.

B.

Second, Lin challenges the BIA's alternative finding that, even if Lin's testimony was found

to be credible, he did not meet his burden of establishing past persecution. In order to demonstrate

that he is eligible for asylum, Lin must show that he qualifies as a refugee by providing evidence to

"establish either that he has suffered actual past persecution or that he has a well-founded fear of

future persecution," on account of race, religion, nationality, membership in a particular social group,

or political opinion. *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004); *see* 8 U.S.C. §

1101(a)(42)(A).[2]

While persecution is not statutorily defined, this court has previously expounded on what

constitutes persecution for purposes of asylum claims:

> Persecution encompasses more than threats to life or freedom; non-life threatening
> violence and physical abuse also fall within this category. However, to sustain an
> asylum application, the conduct must rise above mere harassment. Types of actions
> that might cross the line from harassment to persecution include: detention, arrest,
> interrogation, prosecution, imprisonment, illegal searches, confiscation of property,
> surveillance, beatings, or torture.

*Gilaj v. Gonzales*, 408 F.3d 275, 285 (6th Cir. 2005) (internal quotation marks omitted). This court

has also noted that "'persecution' within the meaning of 8 U.S.C. § 1101(a)(42)(A) requires more

---

[2] Lin also seeks withholding of removal in addition to discretionary relief of asylum. Under 8 U.S.C. § 1231(b)(3), "[a]n alien seeking withholding of removal must demonstrate that there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (citations and internal quotation marks omitted). "Because an alien must meet a higher burden in establishing a right to withholding of removal than in demonstrating asylum eligibility, an alien who fails to qualify for asylum necessarily does not qualify for withholding of removal." *Id.* Because Lin has not satisfied the asylum burden, he has also failed to qualify for withholding of removal.

than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998).

Lin testified that he was detained only once briefly and "reeducated" about Christianity, and even then, Lin admitted that his detention was not because he was specifically targeted by the police, but rather because his father was taken to the police station. The second time that government authorities allegedly came to Father Nie's house while Lin was present, Lin was neither harmed nor even confronted because he escaped. These two facts might establish that Lin was harassed by the authorities because of his religious activities, but "[h]arassment alone, however, does not rise to the level of 'persecution' under the Act." *Mikhailevitch*, 146 F.3d at 390.[3] Lin's expulsion from high school does not amount to persecution because a reasonable reading of the record leads to the conclusion that he was expelled for participation in a secret club, not because he was practicing Christianity. Similarly, Lin's claims about the Chinese government's searching for him in 2005 and 2006 do not prove any government attacks on him rose to the level of persecution. Even fully accepting Lin's testimony and considering the evidence cumulatively, therefore, the record does not compel reversing the BIA's conclusion as to past persecution.

---

[3] In *Mikhailevitch*, the court faced a set of facts similar to (if not more serious than) this case. The applicant in *Mikhailevitch* alleged he had been interrogated and threatened on several occasions by the Russian government because of his religious activities; he also claimed Russian authorities searched his home and place of work for the same reasons. 146 F.3d at 387. This court, however, affirmed the BIA's conclusion that the petitioner had failed to establish past persecution. *Id.* at 390.

C.

Third, Lin claims the BIA erred in concluding that he failed to establish an objectively reasonable fear of future persecution. Lin has the burden of proving a reasonable fear that he would be persecuted were he to return to China. *Mapouya v. Gonzales*, 487 F.3d 396, 412 (6th Cir. 2007). Because he has not proven that he was subject to past persecution, Lin is not entitled to the presumption that he will suffer future persecution.

Lin claims that because the police were looking for him when he left China, his fear of future persecution is reasonable. As the BIA and IJ both noted, however, whether the police were actively searching for Lin, and why, is debatable. Lin has also offered State Department reports and media accounts chronicling Chinese hostility towards religious groups. But these reports are not unequivocal; for instance, one State Department report offered by Lin states "[Chinese] [l]ocal authorities' handling of unregistered religious groups . . . varied widely," and "[t]he extent of religious freedom continued to vary widely within the country." Lin's family's own experience in the registered church undermines Lin's reliance on gross generalizations about Chinese policy towards Christianity. Therefore, the record does not compel reversing the BIA decision as to the threat of future persecution.

D.

Finally, Lin argues that the record compels the finding that he is entitled to protection under the Convention Against Torture. An applicant for relief under the CAT "bears the burden of establishing it is more likely than not that he or she would be tortured if removed to the proposed country of removal." *Almuhtaseb v. Gonzales*, 453 F.3d 743, 749 (6th Cir. 2006) (internal quotation

marks omitted); *see also* 8 C.F.R. § 1208.16(c)(2). Torture is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person," for one of several enumerated purposes, "by or at the instigation of or with the consent or acquiescence of" the government. *Id.* § 1208.18(a)(1).

Having never been tortured himself, Lin relies entirely upon the general experiences of others. He points to one passage in a State Department country report, which notes that torture remains a widespread practice in China against those detained. This comment alone may establish that Lin has a non-zero chance of being tortured should he return to China, but it does not establish that it is "more likely than not" that he would be tortured. Lin has not even established conclusively that he would be detained, so the probative value of this article is particularly weak. Therefore, Lin has not satisfied his burden under the CAT provisions, and the record does not compel reversal of the BIA.

IV.

Because substantial evidence in the record supports the IJ's and BIA's findings as to Lin, we affirm the decision of the BIA.