NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0663n.06

No. 13-4177

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Aug 26, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| MEI ZHU HUANG, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW |
| | ) | FROM THE UNITED |
| ERIC H. HOLDER, JR, | ) | STATES BOARD OF |
| Attorney General, | ) | IMMIGRATION APPEALS |
| Respondent. | ) | |
| | ) | |
| | ) | |

BEFORE: GIBBONS, SUTTON, and WHITE, Circuit Judges.

**GIBBONS, Circuit Judge.** Mei Zhu Huang, a native and citizen of China, seeks review of an order of the Board of Immigration Appeals (BIA) rejecting several requests for relief. For the following reasons, we deny the petition for review.

**I.**

Huang testified that she was born on September 15, 1976, in Changle City, Fujian Province, China, where she lived until 2008. In late 2006, Huang found out she was pregnant. Huang was thirty years old and single. She testified that she knew it was illegal for unmarried women to have children in China; so she and her boyfriend went to register for a marriage license on January 17, 2007. According to Huang, she was nervous during the registration interview, which attracted suspicion. The registration official told Huang that she would have to submit to a premarital examination before she could register to marry.

Huang testified that she tried to leave, but the registration official threatened to call security. Four family planning officials showed up and forcibly escorted Huang to a clinic. Huang claimed that one of the officials hit her boyfriend and knocked him onto the floor. After the examination, the family planning officials immediately took Huang into a surgical room for a forced abortion. Huang recounted that the officials bound her to a table and "took a cold operator and stuck into . . . [her] lower body." Huang struggled, but the doctors continued. According to Huang, her parents came to pick her up twenty minutes after the procedure. She was fined 3,000 Renminbi, which she did not pay.

Almost two years later, Huang decided to leave China. Huang arrived in Texas on November 12, 2008. She then traveled to New York to meet a friend, and she later met up with her boyfriend. Eight months after arriving, Huang filed an application for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). Even though she was still dating her boyfriend at the time, she did not include a letter or statement from him in her application.

After listening to Huang's testimony, an Immigration Law Judge (IJ) denied Huang's application because she did not find Huang credible. The IJ first noted that Huang's testimony was "lacking in detail." She did not provide testimony about the specifics of the procedure or how it felt. And she did not explain how her parents knew she was at the clinic. The IJ also found the lack of information about and from Huang's boyfriend troubling. The IJ pointed out that Huang did not call her boyfriend when she arrived in the United States and that he did not come meet her in New York. Because Huang's boyfriend was her main corroborating witness, the IJ found the absence of a declaration from him "significant." Finally, the IJ expressed concern with Huang's testimony about why she quit her job in China. The IJ found it more

likely that Huang was planning to leave China and quit her job to be ready, rather than to rest from a procedure that occurred much earlier. Finding Huang's corroborating evidence similarly unreliable, the IJ held that Huang failed to meet her respective burdens.

Huang appealed to the BIA, challenging the IJ's denial of her application for asylum and withholding of removal. The BIA affirmed the IJ's adverse credibility finding. The BIA also agreed that Huang failed to submit sufficient corroborating evidence. The BIA noted that the letter from Huang's father deserved little weight because he was an interested witness who was not available for cross-examination. The BIA likewise discounted Huang's medical records because they were unauthenticated photocopies that did not indicate whether her abortion was voluntary or mandatory.

## II.

"Where the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). To the extent the BIA adopted the IJ's reasoning in its opinion, we also review the IJ's decision. *Id.* We review the IJ's and the BIA's credibility findings under the substantial-evidence standard. *Id.* Under this standard, findings of fact by the BIA and the IJ "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see Yu v. Ashcroft*, 364 F.3d 700, 702–03 (6th Cir. 2004). "Facts relevant to credibility determinations, denial of asylum applications, withholding of removal, and the CAT are all reviewed under this same standard." *Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008).

**III.**

The BIA adopted the IJ's adverse credibility determination. Huang argues that this determination is not supported by substantial evidence. Because Huang filed her application after May 11, 2005, we look to the standards set forth in the REAL ID Act of 2005. *See Hua Tu Lin v. Holder*, 412 F. App'x 848, 853 (6th Cir. 2011). Under the Act, triers of fact should consider the "totality of the circumstances" and take into account "all relevant factors" when making credibility determinations. 8 U.S.C. § 1158 (b)(1)(B)(iii). The factors include:

> the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

*Id.* This is a difficult standard to overcome, and Huang cannot do so.

The IJ based her credibility determination in part on Huang's vague testimony about the forced abortion procedure. We have allowed similar inquiries under the REAL ID Act. *Hua Tu Lin*, 412 F. App'x at 853. "[G]reater specificity in one's testimony corresponds to greater candor and responsiveness, in addition to being permitted for consideration under the 'any other relevant factor' catch-all." *Id.* (quoting § 1158(b)(1)(B)(iii)). The IJ noted that Huang did not provide specific details about the actual abortion procedure, even though she claimed she was forced to undergo the procedure without anesthesia. This finding is supported by the record. Huang repeatedly stated that she resisted the procedure and screamed for the doctors to stop; but her testimony about the procedure itself never became more specific than a general reference to a cold object. Huang did not, for example, describe the various steps of the procedure, estimate

how long the procedure took, or really explain how the procedure felt. In addition, Huang never explained how her parents learned about the procedure, which she said happened immediately after the forced examination, or how they were able to come to the hospital so quickly.

Huang also relies on State Department reports in the administrative record to bolster her credibility. She overstates their contents. The 2007 report states that in 2003 China repealed its national requirement for premarital medical examinations. Huang's home province of Fujian, it is true, continues to require "unspecified 'remedial measures'" for unplanned pregnancies, but it is not one of seven provinces listed that require forced abortions. The report states that "Consulate General officials visiting Fujian . . . did not find any cases of physical force employed in connection with abortion or sterilization. . . . [They] have found that many violators of the one-child policy paid fines but found no evidence of forced abortion . . . ." Indeed, physicians in Fujian who consult with American officials have reported no signs of forced abortions since the 1980s.

Although we agree with the dissent that Huang's testimony may support a different conclusion, we disagree that her testimony compels it. *See Klawitter v. INS*, 970 F.2d 149, 152 (6th Cir. 1992). We recognize, however, that credibility determinations based solely on a lack of details are difficult to review. An applicant or a witness can always go into more detail and can rarely anticipate which set of details the fact-finder desires. In this case, though, the IJ found Huang incredible for additional reasons. Under the REAL ID Act, these deficiencies are relevant to the IJ's credibility determinations, even though they do not concern the forced abortion. *See Slyusar v. Holder*, 740 F.3d 1068, 1072–73 (6th Cir. 2014) (citing § 1158(b)(1)(B)(iii)).

First, the IJ found the absence of information about Huang's boyfriend troubling. As discussed by the IJ, Huang's testimony about her boyfriend was hazy, at best. *See Hua Tu Lin*,

412 F. App'x at 853 (upholding an IJ's adverse credibility determination because the applicant's testimony was "general" and "opaque"). Huang glossed over her second attempt to register for a marriage license, her boyfriend's decision to leave China, her decision to follow, their ultimate breakup, and everything in-between. As the IJ noted, these deficiencies are important because Huang's relationship was the backdrop of her story—from her forced abortion to her decision to come to the United States. Without any particulars, the IJ could not "verify any of the events that [Huang] generally claimed happened to her." And, significantly, the IJ placed the most emphasis on Huang's failure to obtain a declaration from her boyfriend. As the IJ noted, Huang "knew enough to obtain documents from her doctor and to either bring them or send them to corroborate her claim but does not list her boyfriend as a witness or get a declaration from him although she says he was present and a witness to the events, including when she was forcibly taken for the abortion." The dissent agrees that Huang's failure to obtain a declaration is significant, yet it still would hold that the IJ's adverse credibility decision was unreasonable because the IJ ignored Huang's explanations for her testimony. But the IJ acknowledged the favorable facts mentioned by the dissent and weighed them accordingly. That we may weigh them differently does not mean that the record compels a different result.

The IJ also determined that parts of Huang's story were implausible. For example, the IJ doubted Huang's testimony that she quit work in September 2008 for medical reasons. In support of its finding, the IJ remarked that it was unlikely that Huang was experiencing complications from a January 2007 procedure.[1] The dissent points out that Huang did not directly testify that she quit work because of complications from an abortion procedure, but

---

[1] The IJ's decision incorrectly miscalculates the time between January 2007 and September 2008. The IJ's decision says that Huang's abortion procedure occurred more than nine months before she quit her job. In fact, according to Huang's testimony, the procedure occurred a year and nine months earlier.

rather because of an irregular menstrual cycle. But this was not necessarily an error on the IJ's part. In discussing the procedure, Huang testified that she had an infection in her uterus that lasted two years after the procedure. From this testimony, it is easy to infer that the menstrual cycle problems were related to this infection and therefore also related to the procedure. Regardless, the IJ found Huang's testimony that she quit her job for medical reasons implausible because of the close timing to Huang's trip to the United States. The IJ thought it much more plausible that Huang quit her job so she could wait for the snakehead to contact her with travel plans. As the IJ acknowledged, the reason Huang quit her job was not a problem; rather, the problem is that Huang was not entirely honest. Because the IJ doubted Huang's story on this issue, the IJ had more reason to doubt Huang's testimony about the more important parts of her story. *See Slyusar*, 740 F.3d at 1072–73 (citing § 1158(b)(1)(B)(iii)). Huang does not offer any evidence showing that a reasonable adjudicator would be compelled to decide the case differently. *See* 8 U.S.C. § 1252(b)(4)(B).

Huang argues that she should still prevail because the IJ failed to point out these problems with Huang's testimony and ask Huang to elaborate. We disagree. While an IJ has a general duty to ensure that the record is fully developed, *see Abdurakhmanov v. Holder*, 735 F.3d 341 n.4 (6th Cir. 2012), an IJ does not function as an applicant's advocate. Huang ultimately bore the burden of proof under her application for asylum, 8 C.F.R. § 1208.13, and withholding of removal, *id.* § 208.16(b). *See Zoarab v. Mukasey*, 524 F.3d 777, 783 (6th Cir. 2008) (noting that an applicant bears a higher burden to prove withholding of removal). Significantly, Huang was represented by counsel. *See El Harake v. Gonzales*, 210 F. App'x 482, 487 n.8 (6th Cir 2006) (distinguishing an IJ's obligation to develop the record in a case involving a *pro se* applicant from one involving a represented applicant). The IJ did not prevent Huang

from testifying or presenting evidence. In fact, the IJ asked Huang clarifying questions throughout the hearing. There was no error.

**IV.**

Huang challenges the BIA's determination that her corroborating evidence was weak. As an initial matter, we find no problem with the BIA's (and the IJ's) requirement that Huang produce corroborating information about the forced abortion procedure. *See* 8 U.S.C. § 1158(b)(1)(B)(ii); *Yan Chen v. Holder*, 423 F. App'x 557, 561 (6th Cir. 2011) ("Because the immigration judge found that [the applicant] was not credible, he could have properly determined that [the applicant] was obligated to provide objective corroboration of her claims.").

We also find no error with the BIA's and IJ's conclusion that Huang failed to provide sufficient corroborative evidence. Although Huang provided a letter from her father, his version of the events did not quite match up with hers. Moreover, the BIA and the IJ may give his testimony less weight because he was an interested witness. *See Mohamed v. Holder*, 542 F. App'x 446, 450 (6th Cir. 2013); *Qiao Zhen Jiang v. Holder*, 341 F. App'x 126, 128 (6th Cir. 2009). Additionally, the BIA and IJ correctly noted that Huang's medical records deserved limited weight because they were unauthenticated photocopies and because the translated version inaccurately combined the records into one document, as if they all were written on official letterhead. *See Ramaj v. Gonzales*, 466 F.3d 520, 530 (6th Cir. 2006) (holding that deficiencies in translation justify the exclusion of documents). And, even if given full weight, a generous reading of the documents only shows that Huang had an abortion—not that the abortion was forced. We disagree with the dissent that this distinction "is of no consequence." The IJ found Huang incredible on her testimony that she was forced to have an abortion, and the documents cannot corroborate this fact.

In light of this weak evidence, the BIA and the IJ were right to question Huang's failure to produce testimony—live or written—from her former boyfriend.  Huang's boyfriend was with Huang when she registered to marry and when she was forced to submit to the premarital examination that ended in a forced abortion.  They were still together when she filed her applications.  Huang's only explanation for not including testimony from her boyfriend was that "he did not think of it at the time."  This explanation is not enough.  *See Dorosh v. Ashcroft*, 398 F.3d 379, 383 (6th Cir. 2004).

## V.

For the above reasons, we deny Huang's petition for review.

HELENE N. WHITE, Circuit Judge, dissenting.  I respectfully dissent.

I.

The IJ found that although Huang's testimony was consistent with her application, she did not provide specific details about the actual abortion procedure and how it felt.  The record does not support this conclusion.  Huang provided the following detailed account.  The marriage registration official became suspicious of her when she refused a physical exam.  At that point, she was not permitted to leave, and was forced to undergo an ultrasound examination showing she was two months pregnant.  A.R. 87.  Huang was told that because she broke the law, the officials would perform an abortion on her that day.  *Id*.  Although Huang begged for mercy, told officials that she had reached a mature age, and this was her first pregnancy, she was forcibly taken to a surgical room.  *Id*. at 89.  There were two doctors in the surgical room, one male and one female.  *Id*.  When Huang refused an order to take off her pants and began to struggle, the officials bound her to the operating table, took off her pants, put her legs on a "supporter," and stuck "a cold operator" into her body.  *Id*. at 90–91.  Despite her pleas to be released, the doctors continued.  *Id*.  Huang was told that if she continued to struggle, the procedure would be more painful.  *Id*.  The doctors then "took this operator and [kept] moving it within [her] body," causing Huang to lose a lot of blood.  *Id*. at 91.  Because Huang continued to struggle, they ordered her to be quiet and stuck a towel in her mouth.  *Id*.  Huang testified: "And then from my bottom they pull[ed] out piece by piece flesh and blood" and "my poor child was killed [this] way."  *Id*. at 92.  Following the procedure, Huang was sent to the delivery room of the hospital.  Her parents came to pick her up approximately twenty minutes after the procedure.

Huang attempted to register for marriage with her boyfriend a second time, but was refused because she violated the law by becoming pregnant before marriage and did not pay the

3,000 Renminbi fine. *Id*. at 93. On January 24, 2007, Huang began having hot and cold flashes and feeling lower body pain. She went to a health clinic in Xiu Cheng for an examination, was told she had an infection, and was given internal and external medications. *Id*. at 93–94. This condition persisted for the next two years. *Id*. at 94.

Huang gave detailed testimony about the events leading to the forced abortion, the forced abortion itself, and the events following it. *See Guang Hua Huang v. Ashcroft*, 113 F. App'x 695, 700 (6th Cir. 2004) (holding that any reasonable adjudicator would be compelled to conclude that Huang was credible in describing his wife's forced abortion where he gave detailed testimony about the events leading to and following his wife's abortion, with only minor inconsistencies). Any reasonable adjudicator would be compelled to conclude that this testimony was uncontroverted, detailed, consistent, and believable. *See Gao v. Ashcroft*, 133 F. App'x 223, 228 (6th Cir. 2005) (reversing adverse credibility determination where her testimony about her forced abortion in China was uncontroverted, detailed, consistent, and believable). Although these cases were decided prior to the enactment of the REAL ID Act of 2005, their holdings that detailed and consistent testimony is sufficient to establish that a forced abortion took place are still applicable.

## II.

"The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1(B)(ii). Even assuming that Huang's testimony requires corroboration, Huang provided corroborating medical evidence of her procedure.

Huang supplied a "Clinic Disease Record." A.R. at 410–13. The first page of the record contains letterhead with the name of the clinic, Huang's name and personal information, and is dated January 24, 2007. *Id*. at 410. The second page is also dated January 24, 2007, titled "Clinical Case Record," and includes a "Physical Examination" section stating, "The patient has abortion one week ago in this hospital." *Id*. The evaluation diagnoses Huang with a pelvic infection, prescribes two medications, and is signed by a doctor. *Id*. at 411, 413. Although the translated version of the Clinical Disease Record places the physical examination and diagnosis on the same page as the clinic's letterhead, the copies provided in Chinese show the letterhead, date, and personal information on one page, and the remaining information on a separate lined page. *Id*. at 410–13.

The IJ determined that Huang's medical records deserved limited weight because the second page, containing the information that supports Huang's claim, is "simply notebook paper" with information written in Chinese. However, the fact that the second page is lined or may have come from a clinic notebook does not, without more, render the record inauthentic. The government did not offer any basis to question the reliability of the records, and there were no discrepancies between the records and Huang's testimony. The BIA similarly held the records were unauthenticated photocopies, but the fact that Huang submitted a copy rather than the original does not discredit her, *see Gao*, 133 F. App'x at 227, and as the BIA correctly pointed out, the records were signed by a physician. *See Abdurakhmanov v. Holder*, 735 F.3d 341, 348 (6th Cir. 2012) (noting that agency regulation requiring certification of an attested copy is "an option not a requirement").

The BIA also found the records incredible because the translated version of the documents inaccurately combined the records into one document and only provided evidence of

an abortion, not that it was forced. First, Huang's credibility can hardly be based on the accuracy of the format employed by a translator. Second, although this court has excluded documents where the translator's certification is not legible or there is no certification of accuracy, *see Ramaj v. Gonzales*, 466 F.3d 520, 531 (6th Cir. 2006), that is not at issue here. Third, it is of no consequence that the medical record itself does not indicate that the abortion was forced. That information was not relevant to Huang's diagnosis or treatment, and there is no reason to assume it would be included in a medical evaluation addressing a pelvic infection. The agency erred in disregarding these documents. *See Abdurakhmanov,* 735 F.3d at 348.

Huang also provided a declaration from her father corroborating her testimony that her parents picked her up following the forced abortion. The letter further corroborates the infection Huang suffered following the procedure and the family's subsequent efforts to send her to the United States. Even assuming the letter from Huang's father should be afforded less weight because of their relationship, *see Mohamed v. Holder*, 542 F. App'x 446, 450 (6th Cir. 2013), it corroborates Huang's testimony that she underwent a forced abortion, and there is nothing in the father's letter that conflicts with Huang's testimony. The record does not support the BIA's treatment of the corroborating evidence.

Huang's testimony is also supported by U.S. State Department Reports, which indicate that although the government claims to have stopped using forced abortions and sterilizations, forced abortions continue to occur due to intense pressure to keep birth rates low and powerful structural incentives for officials to employ coercive measure to meet population goals. *See* U.S State Dept. Human Rights Report: China (2009), A.R. 202; U.S. State Dept., China: Profile of Asylum Claims and Country Conditions (May 2007), A.R. 201, 222. It continues to be illegal in almost all provinces for a single woman to have a child, and Fujian, the province where Huang is

from, requires "unspecified 'remedial measures' to deal with unauthorized pregnancies." U.S State Dept. Human Rights Report: China (2009), A.R. 203, 221.

### III.

Lastly, the IJ found the absence of information about Huang's boyfriend troubling and concluded that Huang did not sufficiently explain her boyfriend's decision to leave China; it was "incredible and implausible" that she did not call him and he did not meet her when she arrived in the United States; and that Huang failed to explain why she did not marry her boyfriend once in the United States. Similarly, the IJ also determined it was implausible that Huang quit work in September 2008 to rest due to complications from the January 2007 procedure. A.R. 108.

The IJ overstates the deficiencies in Huang's testimony, failing to account for explanations provided by Huang. For example, Huang testified that her boyfriend came to the United States to escape religious persecution and did not pick her up or immediately meet her in New York because he was working in another state. Also, Huang did not assert that her reasons for leaving work were connected to the forced abortion; rather, she stated that she was experiencing physical weakness (a symptom of which was an irregular menstrual cycle) which weakness led to her decision to leave work.

Although the IJ's credibility determinations are entitled to considerable deference, the record overwhelmingly supports that the IJ failed to address explanations provided by Huang and replaced her proffered reason for leaving work with a speculative alternative explanation. "[S]peculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence." *Vasha v. Gonzales*, 410 F.3d 863, 870 (6th Cir. 2005); *see also Liti v. Gonzalez*, 511 F.3d 631, 637 (6th Cir. 2005). Further, it exceeds the

bounds of reasonableness to assume Huang is not credible because she and her boyfriend did not end up getting married. *See Gao*, 133 F. App'x at 228. Although under the REAL ID Act of 2005, "any inconsistency, inaccuracy, or falsehood" need not "go[] to the heart of the applicant's claim," in the instant case, there are no inconsistencies, inaccuracies or falsehoods. *See* 8 U.S.C. § 1158(b)(1)(B)(iii). Unlike other instances where this circuit has held that a claim of forced abortion was not credible, in the instant case, there are no evidentiary inconsistencies, *see Hua Tu Lin v. Holder*, 412 F. App'x 848, 853 (6th Cir. 2011); *Liming Zheng v. Holder*, 410 F. App'x 912, 914 (6th Cir. 2010); *He v. I.N.S.*, 105 F. App'x 54, 57 (6th Cir. 2004), no revisions to Huang's story, *see Lin v. Gonzales*, 152 F. App'x 475, 480 (6th Cir. 2005), and no fake documents critical to the case submitted into evidence, *see Feng Jiang v. Mukasey*, 286 F. App'x 286, 290–91 (6th Cir. 2008).

Although the IJ and BIA were correct that Huang's failure to provide testimony from her boyfriend is "significant," the IJ and BIA's holdings are not supported by reasonable, substantial, and probative evidence on the record considered as a whole. *See Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008). Considering "the totality of the circumstances," 8 U.S.C. § 1158(b)(1)(B)(iii), Huang provided detailed testimony of her forced abortion with corroborating medical evidence and a declaration from her father that, even if accorded limited weight, is consistent with Huang's application and testimony. A reasonable adjudicator could not find Huang incredible based on a lack of detail or corroboration. Moreover, the IJ and BIA exaggerate Huang's omissions, cherry-picking from the record and failing to discuss testimony that was given about both the procedure and the facts surrounding Huang's arrival in New York. Huang's failure to provide corroborating testimony from her boyfriend or an in-depth explanation of the reasons they are no longer together do not contradict her testimony or

corroborating evidence, are not falsehoods, and, in light of the record as a whole, are not fatal.

Thus, I would reverse the BIA's dismissal of Huang's asylum and withholding of removal claims

and remand to the BIA for a determination on the merits of those claims.