HELENE N. WHITE, Circuit Judge,
dissenting. I respectfully dissent.
I.
The IJ found that although Huang’s testimony was consistent with her application, she did not provide specific details about the actual abortion procedure and how it felt. The record does not support this conclusion. Huang provided the following detailed account. The marriage registration official became suspicious of her when she refused a physical exam. At that point, she was not permitted to leave, and was forced to undergo an ultrasound examination showing she was two months pregnant. A.R. 87. Huang was told that because she broke the law, the officials would perform an abortion on her that day. Id. Although Huang begged for mercy, told officials that she had reached a mature age, and this was her first pregnancy, she was forcibly taken to a surgical room. Id. at 89. There were two doctors in the surgical room, one male and one female. Id. When Huang refused an order to take off her pants and began to struggle, the officials bound her to the operating table, took off her pants, put her legs on a “supporter,” and stuck “a cold operator” into her body. Id. at 90-91. Despite her pleas to be released, the doctors continued. Id. Huang was told that if she continued to struggle, the procedure would be more painful. Id. The doctors then “took this operator and [kept] moving it within [her] body,” causing Huang to lose a lot of blood. Id. at 91. Because Huang continued to struggle, they ordered her to be quiet and stuck a towel in her mouth. Id. Huang testified: “And then from my bottom they pull[ed] out piece by piece flesh and blood” and “my poor child was killed [this] way.” Id. at 92. Following the procedure, Huang was sent to the delivery room of the hospital. Her parents came to pick her up approximately twenty minutes after the procedure.
Huang attempted to register for marriage with her boyfriend a second time, but was refused because she violated the law by becoming pregnant before marriage and did not pay the 3,000 Renminbi fine. Id. at 93. On January 24, 2007, Huang began having hot and cold flashes and feeling lower body pain. She went to a health clinic in Xiu Cheng for an examination, was told she had an infection, and was given internal and external medications. Id. at 93-94. This condition persisted for the next two years. Id. at 94.
Huang gave detailed testimony about the events leading to the forced abortion, the forced abortion itself, and the events following it. See Guang Hua Huang v. Ashcroft, 113 Fed.Appx. 695, 700 (6th Cir.2004) (holding that any reasonable adjudi *594 cator would be compelled to conclude that Huang was credible in describing his wife’s forced abortion where he gave detailed testimony about the events leading to and following his wife’s abortion, with only minor inconsistencies). Any reasonable adjudicator would be compelled to conclude that this testimony was uncontroverted, detailed, consistent, and believable. See Gao v. Ashcroft, 133 Fed.Appx. 223, 228 (6th Cir.2005) (reversing adverse credibility determination where her testimony about her forced abortion in China was uncontroverted, detailed, consistent, and believable). Although these cases were decided prior to the enactment of the REAL ID Act of 2005, their holdings that detailed and consistent testimony is sufficient to establish that a forced abortion took place are still applicable.
II.
“The testimony of the applicant may be sufficient to sustain the applicant’s burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant’s testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee.” 8 U.S.C. § 1158(b)(1)(B)(ii). Even assuming that Huang’s testimony requires corroboration, Huang provided corroborating medical evidence of her procedure. Huang supplied a “Clinic Disease Record.” A.R. at 410-13. The first page of the record contains letterhead with the name of the clinic, Huang’s name and personal information, and is dated January 24, 2007. Id. at 410. The second page is also dated January 24, 2007, titled “Clinical Case Record,” and includes a “Physical Examination” section stating, “The patient has abortion one week ago in this hospital.” Id. The evaluation diagnoses Huang with a pelvic infection, prescribes two medications, and is signed by a doctor. Id. at 411, 413. Although the translated version of the Clinical Disease Record places the physical examination and diagnosis on the same page as the clinic’s letterhead, the copies provided in Chinese show the letterhead, date, and personal information on one page, and the remaining information on a separate lined page. Id. at 410-13.
The IJ determined that Huang’s medical records deserved limited weight because the second page, containing the information that supports Huang’s claim, is “simply notebook paper” with information written in Chinese. However, the fact that the second page is lined or may have come from a clinic notebook does not, without more, render the record inauthentic. The government did not offer any basis to question the reliability of the records, and there were no discrepancies between the records and Huang’s testimony. The BIA similarly held the records were unauthenticated photocopies, but the fact that Huang submitted a copy rather than the original does not discredit her, see Gao, 133 Fed.Appx. at 227, and as the BIA correctly pointed out, the records were signed by a physician. See Abdurakhmanov v. Holder, 735 F.3d 341, 348 (6th Cir.2012) (noting that agency regulation requiring certification of an attested copy is “an option not a requirement”).
The BIA also found the records incredible because the translated version of the documents inaccurately combined the records into one document and only provided evidence of an abortion, not that it was forced. First, Huang’s credibility can hardly be based on the accuracy of the format employed by a translator. Second, although this court has excluded documents where the translator’s certification is not legible or there is no certification of accuracy, see Ramaj v. Gonzales, 466 F.3d 520, 531 (6th Cir.2006), that is not at issue here. Third, it is of no consequence that *595 the medical record itself does not indicate that the abortion was forced. That information was not relevant to Huang’s diagnosis or treatment, and there is no reason to assume it would be included in a medical evaluation addressing a pelvic infection. The agency erred in disregarding these documents. See Abdurakhmanov, 735 F.3d at 348.
Huang also provided a declaration from her father corroborating her testimony that her parents picked her up following the forced abortion. The letter further corroborates the infection Huang suffered following the procedure and the family’s subsequent efforts to send her to the United States. Even assuming the letter from Huang’s father should be afforded less weight because of their relationship, see Mohamed v. Holder, 542 Fed.Appx. 446, 450 (6th Cir.2013), it corroborates Huang’s testimony that she underwent a forced abortion, and there is nothing in the father’s letter that conflicts with Huang’s testimony. The record does not support the BIA’s treatment of the corroborating evidence.
Huang’s testimony is also supported by U.S. State Department Reports, which indicate that although the government claims to have stopped using forced abortions and sterilizations, forced abortions continue to occur due to intense pressure to keep birth rates low and powerful structural incentives for officials to employ coercive measure to meet population goals. See U.S State Dept. Human Rights Report: China (2009), A.R. 202; U.S. State Dept., China: Profile of Asylum Claims and Country Conditions (May 2007), A.R. 201, 222. It continues to be illegal in almost all provinces for a single woman to have a child, and Fujian, the province where Huang is from, requires “unspecified ‘remedial measures’ to deal with unauthorized pregnancies.” U.S State Dept. Human Rights Report: China (2009), A.R. 203, 221.
III.
Lastly, the IJ found the absence of information about Huang’s boyfriend troubling and concluded that Huang did not sufficiently explain her boyfriend’s decision to leave China; it was “incredible and implausible” that she did not call him and he did not meet her when she arrived in the United States; and that Huang failed to explain why she did not marry her boyfriend once in the United States. Similarly, the IJ also determined it was implausible that Huang quit work in September 2008 to rest due to complications from the January 2007 procedure. A.R. 108.
The IJ overstates the deficiencies in Huang’s testimony, failing to account for explanations provided by Huang. For example, Huang testified that her boyfriend came to the United States to escape religious persecution and did not pick her up or immediately meet her in New York because he was working in another state. Also, Huang did not assert that her reasons for leaving work were connected to the forced abortion; rather, she stated that she was experiencing physical weakness (a symptom of which was an irregular menstrual cycle) which weakness led to her decision to leave work.
Although the IJ’s credibility determinations are entitled to considerable deference, the record overwhelmingly supports that the IJ failed to address explanations provided by Huang and replaced her proffered reason for leaving work with a speculative alternative explanation. “[Speculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence.” Vasha v. Gonzales, 410 F.3d 863, 870 (6th Cir.2005); see also Liti v. Gonzales, 411 F.3d 631, 637 (6th Cir.2005). *596 Further, it exceeds the bounds of reasonableness to assume Huang is not credible because she and her boyfriend did not end up getting married. See Gao, 133 Fed.Appx. at 228. Although under the REAL ID Act of 2005, “any inconsistency, inaccuracy, or falsehood” need not “go[ ] to the heart of the applicant’s claim,” in the instant case, there are no inconsistencies, inaccuracies or falsehoods. See 8 U.S.C. § 1158(b)(1)(B)(iii). Unlike other instances where this circuit has held that a claim of forced abortion was not credible, in the instant case, there are no evidentiary in consistencies, see Hua Tu Lin v. Holder, 412 Fed.Appx. 848, 853 (6th Cir.2011); Liming Zheng v. Holder, 410 Fed.Appx. 912, 914 (6th Cir.2010); He v. I.N.S., 105 Fed.Appx. 54, 57 (6th Cir.2004), no revisions to Huang’s story, see Lin v. Gonzales, 152 Fed.Appx. 475, 480 (6th Cir.2005), and no fake documents critical to the case submitted into evidence, see Feng Jiang v. Mukasey, 286 Fed.Appx. 286, 290-91 (6th Cir.2008).
Although the IJ and BIA were correct that Huang’s failure to provide testimony from her boyfriend is “significant,” the IJ and BIA’s holdings are not supported by reasonable, substantial, and probative evidence on the record considered as a whole. See Koulibaly v. Mukasey, 541 F.3d 613, 619 (6th Cir.2008). Considering “the totality of the circumstances,” 8 U.S.C. § 1158(b)(1)(B)(iii), Huang provided detailed testimony of her forced abortion with corroborating medical evidence and a declaration from her father that, even if accorded limited weight, is consistent with Huang’s application and testimony. A reasonable adjudicator could not find Huang incredible based on a lack of detail or corroboration. Moreover, the IJ and BIA exaggerate Huang’s omissions, cherry-picking from the record and failing to discuss testimony that was given about both the procedure and the facts surrounding Huang’s arrival in New York. Huang’s failure to provide corroborating testimony from her boyfriend or an in-depth explanation of the reasons they are no longer together do not contradict her testimony or corroborating evidence, are not falsehoods, and, in light of the record as a whole, are not fatal. Thus, I would reverse the BIA’s dismissal of Huang’s asylum and withholding of removal claims and remand to the BIA for a determination on the merits of those claims.