RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0064a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

AZIZ A. ABDURAKHMANOV,

               *Petitioner,*

    *v.*

ERIC H. HOLDER, JR., Attorney General,

               *Respondent.*

No. 10-4263

————————————

On Petition for Review of a Decision
of the Board of Immigration Appeals.
No. A095-309-105.

Argued: September 20, 2011

Decided and Filed: March 1, 2012

Before: BATCHELDER, Chief Judge; McKEAGUE and STRANCH, Circuit

Judges.

————————————

## COUNSEL

————————————

**ARGUED:** Charleston C. Wang, Cincinnati, Ohio, for Petitioner. C. Frederick Sheffield, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** E. Dennis Muchnicki, Dublin, Ohio, for Petitioner. C. Frederick Sheffield, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

————————————

## AMENDED OPINION

————————————

JANE B. STRANCH, Circuit Judge. Aziz Abdurakhmanov ("Abdurakhmanov"), a citizen of Uzbekistan, alleges that he was targeted for investigation and beaten by Uzbeki police because of his membership in the Dungan ethnic minority. He further alleges that if he is returned to Uzbekistan, he will face the same fate as his late wife,

who died of injuries inflicted on her by Uzbeki police during a three-day detention. The Immigration Judge and the Board of Immigration Appeals denied his applications for asylum, withholding of removal, and relief under the Convention Against Torture based on both an adverse credibility determination and a lack of corroborating evidence supporting his claims. The agency's decision suffers from a number of errors regarding its findings on credibility and corroborating evidence. Nonetheless, one critical credibility finding is supported by substantial evidence, and so we must dismiss Abdurakhmanov's petition for review.

## I. BACKGROUND

### A.    Facts

During 1998, while living in Tashkent, Abdurakhmanov graduated from medical school, married, and had a son, Aziz. He, his wife, Yelena, and son are all members of the Dungan ethnicity, a group he says is readily distinguishable from ethnic Uzbekis because they have lighter skin and hair and are shorter. Abdurakhmanov claims that both he and his wife faced substantial persecution due to their ethnicity. He was arrested at least one time while in Uzbekistan, on February 16, 1999, and was accused of terrorism after an explosion that was aimed at taking the life of then-President Karimov. Abdurakhmanov claims that he happened to be in the vicinity of the explosion and was rounded up along with other Dungans for questioning due solely to his ethnicity. He was held for three days, during which he was beaten repeatedly with batons in an effort to force a written confession, which he did not sign.

After graduation, Abdurakhmanov began working at a clinic as an abdominal surgeon. As compared to Uzbeki surgeons, he claims that he made less money, was forced to work longer and more difficult shifts, and was denied the types of surgeries that would give him meaningful experience as a surgeon. He was disciplined for his absence from work due to his arrest in 1999 and eventually left this employment.

In late-March 2000, Yelena was stopped by two Uzbeki police officers who began taunting her. Abdurakhmanov claims that she was stopped because she was

Dungan and the officers wanted to humiliate her. They made numerous sexual advances and when she refused, they took her into police custody for three days during which she was repeatedly beaten and sexually assaulted. Abdurakhmanov claims that she was harmed emotionally and physically and could not recuperate. He took her to the hospital three days after her release where she died. Her death certificate states that she died on April 5, 2000 as a result of head trauma. Abdurakhmanov claims that he attempted to force an investigation into his wife's death but that neither police nor prosecutors would help him due to his ethnicity. Not long after, he obtained a visa to come to the United States.

**B.    Procedural History**

Abdurakhmanov obtained a non-immigrant visa for pleasure and entered the United States on April 7, 2001. He renewed the visa once in October before eventually applying for asylum with the former Immigration and Nationality Service on March 26, 2002. The Service denied his application and referred him to an Immigration Court as removable. He reapplied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").

At his merits hearing before the Immigration Judge ("IJ") on May 6, 2008, Abdurakhmanov testified about the mistreatment he and his wife suffered in Uzbekistan and provided corroborating evidence including his 2002 asylum application, his 2005 asylum application completed on the updated form, various country reports, and reports on the treatment of Dungans in Uzbekistan. The exhibits attached to the 2002 application were: a health certificate of his physical condition after his release from detention in 1999; a summons to appear at a military department; his wife's death certificate; and, his son's birth certificate.

After the hearing, the IJ filed a written decision denying the relief sought based on Abdurakhmanov's lack of credibility and a lack of corroborating evidence. Abdurakhmanov appealed the IJ's decision to the Board of Immigration Appeals

("BIA"), which upheld the IJ's decision.[1]  Specifically, the BIA found that the IJ's adverse credibility determination was not clearly erroneous based on three inconsistencies:  (1) the circumstances under which Abdurakhmanov left his job as a surgeon; (2) the number of times he had been arrested; and, (3) his wife's condition upon release from detention.  As to Abdurakhmanov's corroborating evidence, the BIA agreed with the IJ that some of the documents actually undermined his credibility and that they deserved little weight because they were not contemporaneous documents or originals.

## II.  DISCUSSION

### A.    Standard of Review

"Because the BIA adopted and supplemented the IJ's decision, we review the opinion of the IJ in conjunction with the BIA's additional comments and discussion." *Cruz-Samayoa v. Holder*, 607 F.3d 1145, 1149 (6th Cir. 2010).  The agency's findings of fact are reviewed for substantial evidence, and questions of law are reviewed de novo. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009).  The substantial-evidence standard requires us to defer to the agency's findings of fact "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Mikhailevitch v. I.N.S.*, 146 F.3d 384, 388 (6th Cir. 1998) (quoted authorities omitted).  "Under this standard, we will not reverse a factual determination . . . unless we find 'that the evidence not only supports a contrary conclusion, but compels it." *Ceraj v. Mukasey*, 511 F.3d 583, 588 (6th Cir. 2007) (citation and emphasis omitted).

We have previously articulated the legal standard for granting asylum:

"The disposition of an application for asylum involves a two-step inquiry: (1) whether the applicant qualifies as a refugee as defined in 8 U.S.C. § 1101(a)(42)(A), and (2) whether the applicant merits a favorable exercise of discretion by the Attorney General." *Kouljinski v. Keisler*, 505 F.3d 534, 541 (6th Cir. 2007) (internal quotation marks

---

[1]The IJ also found that Abdurakhmanov had not adequately proven that he was of Dungan ethnicity.  Specifically, the IJ credited a Wikipedia article about Dungans over Abdurakhmanov's testimony, stating that Abdurakhmanov did not appear to share the characteristics that the article attributed to Dungans.  The BIA held, however, that Abdurakhmanov's testimony should not be discredited based on a Wikipedia excerpt and declined to consider this ground on appeal.

omitted). "[T]o qualify as a refugee," the applicant must establish "that he or she has suffered past persecution on the basis of race, religion, nationality, social group, or political opinion; or . . . show[] that he or she has a well-founded fear of persecution on one of those same bases." *Id.*; *see also* 8 C.F.R. § 1208.13(b). If an individual is eligible for asylum, then the applicant bears the "burden of establishing that the favorable exercise of discretion is warranted." *Kouljinski*, 505 F.3d at 542 (internal quotation marks omitted).

*Cruz-Samayoa*, 607 F.3d at 1150-51. "An applicant who establishes past persecution is presumed to have a well-founded fear of future persecution." *Pilica v. Ashcroft*, 388 F.3d 941, 950 (6th Cir. 2004). Otherwise, to establish a well-founded fear of future persecution, the applicant must demonstrate "(1) that he has a fear of persecution in his home country on account of race, religion, nationality, membership in a particular social group, or political opinion; (2) that there is a reasonable possibility of suffering such persecution if he were to return to that country; and (3) that he is unable or unwilling to return to that country because of such fear." *Id.* Withholding of removal claims are analyzed under the same framework, except that the "alien must show a 'clear probability' of persecution." *Dugboe v. Holder*, 644 F.3d 462, 471-72 (6th Cir. 2011).[2]

**B.        The Adverse Credibility Determination**

"Credibility determinations are findings of fact," and are reviewed for substantial evidence. *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004).[3] An "immigration judge's conclusion must be supported by specific reasons and must be based upon issues that go to the heart of the applicant's claim. In other words, if discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Ceraj*, 511 F.3d at 591 (internal citations and quotation omitted). We review separately each of the three inconsistencies upon which the IJ and BIA based the adverse credibility determination.

---

[2]The BIA held that Abdurakhmanov did not "meaningfully challenge the denial of CAT protection" in his appeal and thus deemed that claim waived. As Abdurakhmanov has not raised the issue of relief under CAT in his briefs before this Court, we also deem it waived. *See, e.g.*, *United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006).

[3]Abdurakhmanov filed his asylum application prior to the May 11, 2005 effective date of the REAL ID Act of 2005. Consequently, his petition is not subject to the provisions of that Act.

We begin with the agency's third finding of inconsistency because it is most easily resolved.    This ground is based on a purported discrepancy between Abdurakhmanov's hearing testimony and his wife's death certificate.    The death certificate indicates that Yelena died from "hard injury to the back of the head."    The IJ found Abdurakhmanov incredible because "[h]e made no mention of his wife having received a massive head injury that caused her death," and the BIA considered this "[a]nother notable discrepancy" supporting the IJ's adverse credibility determination. This finding is flatly contradicted by Abdurakhmanov's testimony that the police "beat her up on the chest, on the head, they used batons."    Therefore, this ground cannot support the agency's adverse credibility finding.

The second ground is based on a purported discrepancy between Abdurakhmanov's asylum application and his testimony.    In the application, Abdurakhmanov alleged that he was arrested and beaten in 1999, after the assassination attempt, and that he was also detained and beaten in 2000 after demanding an investigation into his wife's death.    Specifically, Abdurakhmanov stated in his asylum application that he was "defended [arrested?] in the police dept. and beaten because I wanted to find the guilties in my wife's death."    At the hearing, however, he reported in response to the IJ's query that he had been arrested only once in 1999.    This response persuaded the IJ that Abdurakhmanov was not credible because he did not testify about any beating in relation to the 2000 detention, and the BIA agreed that "[t]he respondent also gave varying accounts of the number of times he had been arrested in Uzbekistan."

The agency's credibility finding on this ground appears to be questionable.    The asylum application used the phrase "defended [arrested?]."    Abdurakhmanov's inartful description of his treatment at the hands of Uzbeki police does not confirm that he was, in fact, arrested in 2000.    The most direct way to obtain clarification about the meaning of the asylum application would have been for the IJ to ask Abdurakhmanov exactly what he meant by "defended [arrested?]."    Instead, the IJ asked how many times he had been arrested, "officially or unofficially."    Abdurakhmanov responded that he had been

arrested one time.[4]    Considering the question posed, Abdurakhmanov's answer is no more indicative of incredibility than it is indicative of an inability to distinguish between an official arrest and an unofficial, yet still relevant, physical detention.  Our view is supported by Abdurakhmanov's insertion of a question mark beside the term "arrested" in his asylum application, indicating he held some reservation about use of that term.

Whether we would be compelled, on this record, to come to a contrary conclusion as to Abdurakhmanov's credibility on this point is perhaps in doubt.  We need not definitively resolve the issue, however, because the agency's adverse credibility determination on another ground is supported by substantial evidence.

This last issue again concerns a discrepancy between the asylum application and the hearing testimony.  In the application, Abdurakhmanov wrote:  "My boss said, 'You're fired.' I asked why.  He said, 'Police call me.  Maybe you extremist.'  I lost my job."  When his own attorney asked him at the hearing whether he was fired from his job as a surgeon, however, Abdurakhmanov unequivocally stated that he was not fired and he quit because he was not given the same surgical opportunities as Uzbeki surgeons.  This discrepancy suggests that the asylum application was drafted in an attempt to enhance Abdurakhmanov's claim of persecution.  Like the IJ, the BIA held that Abdurakhmanov's lack of credibility on this point "call[s] into question the veracity of the claimed arrest" and thus "go[es] to the heart of his claim."  We find this rationale substantially supported on the record as a whole.  Thus, on this basis alone, the agency's adverse credibility determination can be affirmed.  Abdurakhmanov's reliance on *Sylla v. INS*, 388 F.3d 924 (6th Cir. 2004), and *Koulibaly v. Mukasey*, 541 F.3d 613 (6th Cir. 2008), is misplaced because in both of those cases, minor inconsistencies did not go to the heart of the aliens' claims.  Also, in the latter case, the BIA's adverse credibility determination was based in part on an Assessment to Refer that lacked reliability.  *Koulibaly*, 541 F.3d at 620-24.

---

[4]An IJ has not only an ability, but an obligation, to ask questions of the alien during the hearing to establish a full record.  8 U.S.C. § 1229a(b)(1).  However, that questioning should not be used to draw out testimony that would support the IJ's already-formed determination of adverse credibility; it should be designed to elicit testimony relevant to the fair resolution of the alien's applications.  *Cf. Torres v. Mukasey*, 551 F.3d 616, 626-27 (7th Cir. 2008).

**C.    The Finding of a Lack of Corroborating Evidence**

"'[W]here it is reasonable to expect corroborating evidence for certain alleged facts pertaining to the specifics of an applicant's claim, such evidence should be provided[.]'" *Lin v. Holder*, 565 F.3d 971, 977 (6th Cir. 2009) (quoted authorities omitted). A failure to submit such reasonably available evidence can support the agency's determination that the applicant did not meet her burden of proof. *Id.* An applicant is only required to supply those types of documents that can be "reasonably expected" given his or her circumstances—i.e., only of "the type that would normally be created or available in the particular country and is accessible to the alien, such as through friends, relatives, or co-workers." *Dorosh v. Ashcroft*, 398 F.3d 379, 382–83 (6th Cir. 2004) (quoted case omitted). "An immigration judge's determination regarding the availability of corroborating evidence will not be reversed 'unless the court finds . . . that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." *Lin*, 565 F.3d at 977.

The corroborating evidence standard is typically invoked by IJs when the applicant has submitted little or no evidence to corroborate her testimony. In this case, however, Abdurakhmanov submitted several items of corroborating evidence which the IJ found either to contradict his testimony, to affect his credibility adversely, or to be of little or no weight because the documents were not originals submitted contemporaneously with his asylum application.

First, the IJ found that Yelena's death certificate contradicted Abdurakhmanov's testimony about the manner of his wife's death. We have already explained that the IJ misstated Abdurakhmanov's hearing testimony. Consequently, this finding is not supported by substantial evidence.

Second, the IJ and the BIA erred in construing the law applicable to corroborative evidence. The IJ ruled that, "[b]ecause the respondent does not claim to have received any of these documents contemporaneously with the events in question, the authenticity of the documents is suspect, and the DHS could not conduct a forensic analysis without possession of the originals," relying on *Ramaj v. Gonzales*, 466 F.3d

520 (6th Cir. 2006). The BIA held that "the Immigration Judge was properly concerned about the lack of contemporaneous documents and originals," relying on *Ramaj* and also *Matter of H-L-H-*, 25 I & N Dec. 209 (BIA 2010). Neither *Ramaj* nor *Matter of H-L-H-* support this holding.

In *Ramaj*, we reviewed an IJ's decision that various documents submitted by the petitioner should be excluded from the record because there was no verification that the signatures on the documents were actually those of the persons alleged to have signed them. 466 F.3d at 529. After reviewing the agency's regulations on authentication, we noted that "[t]he IJ may have erred in excluding the . . . documents on this ground[]" because the agency's regulation required attestation by an authorized official only where the document is a copy, and it was unclear whether the documents in that case were copies or originals. *Id.* at 530. This Court also noted, without deciding, that further certification of an attested copy seemed to be "an option and not a requirement." *Id.* Nowhere in the opinion did we address the relative weight to be given originals or photocopies of documentary evidence, nor did we address whether the documents were created contemporaneously with the events in question.

In *Matter of H-L-H-*, the BIA held that documents the applicant obtained from various governmental bodies in her village in China were "entitled to minimal weight" because they "were obtained for the purpose of the hearing, are unsigned and unauthenticated and fail to even identify the authors." *Id.* at 214. These documents were "not a record of a past event, such as a contemporaneously created police report," but were "instead a statement from local government officials of what allegedly will happen to the respondent and her husband in the future if they return." *Id*. The BIA qualified its holding by noting that "asylum applicants cannot always reasonably be expected to have authenticated documents from an alleged persecutor[.]" *Id*. at 215, n.5 (citation omitted).

Abdurakhmanov's corroborating evidence was "obtained for the purpose of the hearing," but unlike the evidence in *Matter of H-L-H-*, Abdurakhmanov's documents were records of past events. They did not purport to speculate about his future treatment

upon his return to Uzbekistan. For example, his health certificate was made shortly after his beating; it was not recreated by the doctor years later in anticipation of the asylum hearing. Comparably, his wife's death certificate was issued following her death in 2000, not years later for the purpose of an immigration hearing. Abdurakhmanov's documents are copies of original documents, recording past events, which were obtained by his relatives prior to his hearing because he had not brought copies with him when he fled Uzbekistan. His corroborative evidence is thus distinguishable from that presented in *Matter of H-L-H-*. Therefore, *Matter of H-L-H-* cannot support the agency's disregard of Abdurakhmanov's corroborating evidence on the grounds that the documents were not made contemporaneously with the events they purported to document. The agency's decision regarding Abdurakhmanov's corroborating evidence is thus contrary to the law of this Circuit and the agency's own binding precedents and cannot be used to support the decision of the IJ or BIA.

### III. CONCLUSION

In summary, we find error in the agency's decision to reject Abdurakhmanov's corroborating evidence. We also conclude that at least one, and perhaps two, of the grounds on which the agency based its adverse credibility determination were not supported by substantial evidence. We agree, however, that substantial evidence supports the agency's determination that Abdurakhmanov lacked credibility when he gave differing reasons for leaving his hospital employment. This adverse credibility finding went to the heart of the claim and was fatal to Abdurakhmanov's asylum application, as he cannot meet his burden of proof without credible testimony. *See El-Moussa v. Holder*, 569 F.3d 250, 256-57 (6th Cir. 2009). For this reason, we **DISMISS** Abdurakhmanov's petition for review.