**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0203n.06

No. 13-4482

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| VOLODYMYR RIMOVICH BOLOTOV, | ) | **FILED** |
| | ) | ***Mar 12, 2015*** |
| Petitioner, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| | ) | ON PETITION FOR REVIEW |
| v. | ) | FROM THE UNITED STATES |
| | ) | BOARD OF IMMIGRATION |
| ERIC H. HOLDER, JR., Attorney General, | ) | APPEALS |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |

BEFORE: KETHLEDGE and DONALD, Circuit Judges; McCALLA, District Judge.[*]

KETHLEDGE, Circuit Judge. Volodymyr Bolotov came to the United States from Ukraine on a tourist visa in 2001. He applied for asylum a year later, and later applied for withholding of removal and protection under the Convention Against Torture (CAT). During a hearing with respect to his applications, Bolotov told an immigration judge that government agents in Ukraine had killed his mother, father-in-law, and brother-in-law because Bolotov saw Ukrainian Secret Service agents burying a headless corpse near a highway. But the IJ denied Bolotov's applications, and ordered him removed. The Board of Immigration Appeals affirmed that decision, and Bolotov filed this petition for review. We deny the petition.

At his hearing before the IJ, Bolotov testified as follows. Bolotov was a law-enforcement officer for the Ministry of Internal Affairs in Ukraine. AR at 181. In 1995, while he was on

---

[*] The Honorable Jon Phipps McCalla, United States District Judge for the Western District of Tennessee, sitting by designation.

duty, he and three other officers came upon government agents burying a woman's headless body. AR at 184-85. After Bolotov reported the incident to his superiors, they forced him to resign and told him to keep quiet. AR at 190. The government placed him under surveillance, and he soon began receiving threatening phone calls. AR at 192. About two years later, in 1997, somebody murdered Bolotov's father-in-law. AR at 331. Bolotov thinks the killers were government agents who mistook his father-in-law for him, because his father-in-law had borrowed Bolotov's car. AR at 193-96; 231-32. About a year later, Bolotov let his brother-in-law borrow a car; the brother-in-law was never seen again. AR at 197. Bolotov says that, after he asked the police to investigate the disappearance, the police handcuffed him to a chair and beat him. AR at 199. Shortly thereafter Bolotov left Ukraine and came to the United States on a tourist visa. Bolotov's wife, daughter, and mother remained behind. The Ukrainian government continued to threaten and abuse them. AR at 226. Bolotov's mother died in January 2002; her death certificate says that she died of heart disease, but Bolotov says she died as a result of injuries she suffered when police officers searched her house and pushed her to the ground. AR at 244.

Bolotov applied for asylum in March 2002. Later that year, the Immigration and Naturalization Service served Bolotov with a notice to appear in removal proceedings, charging him with remaining in the United States after his visa expired. Bolotov conceded removability, but renewed his request for asylum and also applied for withholding of removal and protection under the CAT. In 2011—nine years later—an immigration judge denied Bolotov's applications and ordered him removed. The IJ denied the application for three reasons: first, because Bolotov lacked credibility, based on several purported inconsistencies in his story; second, because Bolotov failed to produce corroborating evidence; and third, because Bolotov failed to

demonstrate that he was persecuted on account of his political opinions. The BIA affirmed the IJ's decision in 2013. This petition for review followed.

Where, as here, the BIA issues its own opinion, we review the BIA's decision. *Koulibaly v. Mukasey*, 541 F.3d 613, 619 (6th Cir. 2008). "To the extent the BIA adopted the immigration judge's reasoning, however, [we] also review[] the immigration judge's decision." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). We review the BIA's findings of fact for substantial evidence. *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012). Under that standard, we defer to the BIA's decision so long as the evidence would allow a reasonable fact-finder to reach the same conclusion. *Koulibaly*, 541 F.3d at 619.

Bolotov first challenges the BIA's credibility determination. Bolotov filed his application before the REAL ID Act took effect, so the BIA's determination "must be supported by specific reasons and must be based upon issues that go to the heart of [his] claim." *Abdurakhmanov,* 735 F.3d at 345 (internal quotation marks omitted). If inconsistencies in Bolotov's story "cannot be viewed as attempts by [Bolotov] to enhance his claims of persecution, they have no bearing on his credibility." *Id.* at 345-46.

Here, the BIA determined that Bolotov lacked credibility based on several purported inconsistencies. First, the BIA said that Bolotov offered inconsistent accounts of the death of his father-in-law, Vladimir. Bolotov testified that Vladimir was shot on September 9 and died four days later, on September 13. AR at 193-94. On the asylum application, however, Bolotov had stated that Vladimir drove to a summer house near Kiev and "[t]he same night he was killed." AR at 359. The BIA believed that the statement that Vladimir "was killed" the night he drove to the summer house was inconsistent with Bolotov's testimony that Vladimir died four days after somebody shot him. But the crux of Bolotov's story—that Vladimir was shot and killed after he

borrowed Bolotov's car—never changed. And whether Vladimir was technically "killed" on the day he received a mortal wound or on the day he finally succumbed to it has has no bearing on Bolotov's credibility, especially considering that Bolotov is not a native English speaker and thus testified through a translator.

Next, the BIA relied on purported inconsistencies in Bolotov's description of the incident that led to his mother's death. Bolitov testified that, after he left Ukraine, police officers searched his mother's house and knocked her to the ground, which caused her to lose consciousness and die a few days later. AR at 244. In his application Bolotov stated that the incident occurred on February 7, 2002. AR at 361. In his testimony, however, Bolotov said the incident occurred on January 6. AR at 226. A death certificate lists his mother's date of death as January 8, 2002, AR at 328. According to the BIA, the inconsistent dates, and the death certificate's mention of heart disease, make Bolotov's story unbelievable. We disagree: the inconsistent dates are a minor discrepancy, which cannot be seen as attempts to exaggerate Bolotov's account of how his mother died. *See Abdurakhmanov*, 735 F.3d at 345-46. Indeed, his account of how she died remained consistent throughout. Nor does the death certificate's stated cause of death support the BIA's credibility determination: a coroner's determination that Bolotov's mother died of a heart attack is consistent with Bolotov's testimony that a few days earlier the police had threatened her and knocked her to the ground.

Finally, the IJ said that Bolotov made inconsistent statements about the investigation into the disappearance of his brother-in-law, Sergei. Bolotov testified that the police did not investigate the disappearance, AR at 197, but in his application he included a newspaper clipping which stated that the Department of Internal Affairs was searching for Sergei. AR 374. Bolotov explained this purported discrepancy during his hearing: he testified that the clipping was an ad

placed by Sergei's family shortly after they notified the Department that he was missing. AR at 229. Thus, all the newspaper clipping shows is that Sergei disappeared; it says nothing about whether the Ukrainian authorities conducted a meaningful investigation.

In short, none of the purported inconsistencies relied on by the BIA "go to the heart of" Bolotov's application for asylum; and indeed several are not even inconsistencies. *Id.* at 345 (internal quotation marks omitted). Instead, this record suggests that the IJ sought out minor discrepancies to buttress his decision to deny Bolotov's application. Thus, the record lacks substantial evidence to support the BIA's credibility determination.

Still, we must deny Bolotov's petition if the BIA's decision can be upheld on the alternative ground that Bolotov failed to provide corroborating evidence to support his story. *See Dorosh v. Ashcroft*, 398 F.3d 379, 382 (6th Cir. 2004). "The absence of [] corroborating evidence can lead to a finding that an applicant has failed to meet her burden of proof" in an asylum application, so long as "it is reasonable to expect corroborating evidence." *Id.*

Here, almost nothing in the record—other than Bolotov's testimony—supports his story. And it was reasonable for the BIA to expect corroborating evidence to support Bolotov's allegations of constant harassment over a period of several years. Bolotov testified that he was still in contact with his wife, but he failed to offer an affidavit or letter from her that corroborated any part of his story. AR at 227. He further testified that he possessed documentation of the injuries he suffered when the police beat him, and that he received a letter from his mother's neighbor which described the incident that caused her death. AR at 236, 246. But Bolotov produced none of these documents in support of his application. Thus, by Bolotov's own admission, he could have provided corroborating evidence, but he failed to do so. Given that

failure, a reasonable factfinder could agree with the BIA's finding that Bolotov failed to provide

corroborating evidence, and therefore failed to meet his burden of proof.

The petition for review is denied.