**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0274n.06

No. 15-4168

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| YURI ZAVADA, | ) | **FILED**<br>May 20, 2016<br>DEBORAH S. HUNT, Clerk |
| | ) | |
| **Petitioner,** | ) | ON PETITION FOR REVIEW |
| | ) | OF A FINAL ORDER OF THE |
| v. | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| LORETTA LYNCH, United States Attorney | ) | |
| General, | ) | |
| | ) | **OPINION** |
| **Respondent.** | ) | |
| | ) | |

**Before: MOORE, SUTTON, and DONALD, Circuit Judges.**

**KAREN NELSON MOORE, Circuit Judge.** Petitioner Yuri Zavada, a citizen of Ukraine, petitions for review of a Board of Immigration Appeals ("BIA") decision denying his application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Zavada contends that he was beaten in Ukraine because of his sexual orientation, and that he fears future bodily harm if he were to return. The Immigration Judge ("IJ") denied Zavada's application because it found Zavada not credible, and the BIA affirmed this determination. Zavada now argues that the BIA failed to consider his application under the appropriate standard and that the BIA's credibility determination is not supported by substantial evidence. For the reasons stated below, we **DENY** Zavada's petition for review.

## I. BACKGROUND

On July 25, 2004, Zavada attempted to enter the United States through Chicago O'Hare International Airport using a fake passport. *See* Administrative Record ("A.R.") at 888–90 (Airport Interview at 1–3). An agent with the Immigration and Naturalization Service ("INS") interviewed Zavada at the airport. *See id.* Zavada told the INS agent that his passport was fraudulent and that he entered the United States "to live here and work." *Id.* at 889 (Airport Interview at 2). Zavada indicated that he did not "have problems in" Ukraine and that he was "not afraid" of returning, though he did not "want to go there anymore." *Id.* at 891 (Jurat for Record of Sworn Statement). Zavada was served with a Notice to Appear on August 12, 2004. *Id.* at 914 (Notice to Appear). Through counsel, Zavada conceded removability to an IJ on August 26, 2004, and indicated his intent to seek asylum. *Id.* at 211 (8/26/04 H'rg Tr. at 3).

Zavada submitted an asylum application on October 21, 2004. *Id.* at 849 (2004 Form I-589). In his application, Zavada explained that he is gay and that he "must go into the military for two years." *Id.* at 853 (2004 Form I-589 at 6). Because the Ukranian "military hates homosexuals and engages in patterns of torture, beatings, humiliation, prison and death against any known homosexual," Zavada indicated that he was "very afraid for [his] well-being." *Id.*; *see also id.* at 857 (2004 Form I-589 at 11). On March 29, 2007, Zavada filed a supplement to his original asylum application. *Id.* at 688, 695 (2007 Form I-589 at 1, 8). Zavada's supplemental application asserted that he "was beaten several times in Ukraine . . . because of [his] sexual orientation which is not accepted in the Ukraine and the government views

homosexuals as lesser persons so they won't help us."  *Id.* at 692 (2007 Form I-589 at 5). Zavada further explained that he feared "[b]eatings, even death" if he were to return to the Ukraine.  *Id.* at 692–93 (2007 Form I-589 at 5–6).

On March 23, 2011, Zavada testified before the IJ at his merits hearing.  *See id.* at 267 (03/23/11 H'rg Tr. at 52).  Zavada explained that he came to the United States because his "life was in danger in Ukraine" due to his sexual orientation.  *Id.* at 267–68 (03/23/11 H'rg Tr. at 52–53).  According to Zavada, in 2001, two friends "started beating" him after they witnessed Zavada kissing his partner in a park.  *Id.* at 268–69 (03/23/11 H'rg Tr. at 53–54).  Following the attack, Zavada fled home, but his attackers followed him and "started throwing stones" at his windows and continued to call him slurs.  *Id.* at 269 (03/23/11 H'rg Tr. at 54).  Zavada did not report this incident to the police because he was afraid that the police were going to beat him.  *Id.* at 270–71 (03/23/11 H'rg Tr. at 55–56).  The next day, "eight or [ten] people" were outside of Zavada's house; when Zavada approached, "they attacked [him] rapidly" until Zavada lost consciousness.  *Id.* at 271 (03/23/11 H'rg Tr. at 56).  Once Zavada regained consciousness, his attackers swore that, because of Zavada's sexual orientation, they were "going to beat [Zavada] up every time" that they saw him.  *Id.* at 272 (03/23/11 H'rg Tr. at 57).  Zavada also testified to another beating that he received when he attempted to return to school; this resulted in his mother arranging for him to take his exams separately from other students.  *Id.* at 273–74 (03/23/11 H'rg Tr. at 58–59).

Following high school, Zavada moved to the city of Lutsk in order to attend university. *Id.* at 274 (03/23/11 H'rg Tr. at 59). During his third year of school, two students from his home town enrolled in the university; according to Zavada, these students beat Zavada up and revealed his sexual orientation to others. *Id.* at 275–76 (03/23/11 H'rg Tr. at 60–61). Zavada "was forced to leave the university," prompting his mother to borrow money and obtain false documents so that Zavada could enter the United States. *Id.* at 276–77 (03/23/11 H'rg Tr. at 61–62).

On cross-examination, the government asked Zavada why he did not mention in his first application for asylum being attacked, but only described his fear of entering the Ukranian military. *Id.* at 302–03 (03/23/11 H'rg Tr. at 87–88). Zavada testified that he "didn't understand" his prior attorney and that it was this prior attorney that told Zavada "something about army and stuff." *Id.* Zavada explained that he "wouldn't serve in the army anyway" because his mother had paid for fake medical records to indicate that Zavada had a medical illness. *Id.* at 303, 328 (03/23/11 H'rg Tr. at 88, 113).

At the close of testimony, the IJ scheduled another hearing so that Zavada would have the opportunity to obtain additional corroboration and testimony. The IJ indicated his concerns about Zavada's application, including the discrepancies between Zavada's first application and his supplement; the IJ stated that Zavada "may want to explain these implausible aspects and incons[istencies] at the next hearing." *Id.* at 360–63 (03/23/11 H'rg Tr. at 145–48).

Zavada testified again on October 19, 2011. *See id.* at 402 (10/19/11 H'rg Tr. at 186). Zavada explained why he first stated during his airport interview that he was not scared to return

4

to Ukraine; according to Zavada, "[t]he person that helped [him] to come to the U.S. told [Zavada]" not to be afraid because even if Zavada were sent back to Ukraine, this person would "find a way to send [Zavada] back to the U.S. again." *Id.* at 428 (10/19/11 H'rg Tr. at 212). Zavada also testified that it was his first attorney who told him about the Ukranian military, and that his first attorney told Zavada that "his task [was] to get [Zavada] out of prison as soon as possible." *Id.* at 434 (10/19/11 H'rg Tr. at 218). According to Zavada, his first attorney told him that "the fact that I'm gay, it's not enough." *Id.* at 435 (10/19/11 H'rg Tr. at 219).

The IJ asked Zavada, "I think you just told me that [your lawyer] told you that he would put in your asylum application that you were afraid of getting tortured in the military in order to facilitate or make it easier for you to get out of an Immigration jail." *Id.* at 434 (10/19/11 H'rg Tr. at 218). Zavada answered, "Yes. That's all his idea. I didn't tell him any of this." *Id.* Zavada explained that he did not speak out against his lawyer's lie because he was "shocked" and "in prison." *Id.* Zavada insisted that he "didn't know that [his lawyer was] going to emphasize this army thing," and that he himself knew that he would not enter military service. *Id.* at 435 (10/19/11 H'rg Tr. at 219).

Two additional witnesses testified at Zavada's hearing: his friend, Steven Shaw, and his ex-boyfriend, Steven Palmer. *See id.* at 340 (3/23/11 H'rg Tr. at 125); *id.* at 383 (10/19/11 H'rg Tr. at 167). Both testified regarding Zavada's sexual orientation and that Zavada had mentioned to them that he suffered beatings while living in Ukraine. *See, e.g.*, *id.* at 348 (3/23/11 H'rg Tr. at 133); *id.* at 385, 391 (10/19/11 H'rg Tr. at 169, 175).

The IJ denied Zavada's application on December 16, 2011. *Id.* at 47 (IJ Dec. at 3). The IJ concluded that Zavada "has told so many inconsistencies and his claim has shifted so much . . . that the Court finds that the respondent has not proffered any credible evidence to, in fact, demonstrate that he is gay." *Id.* at 113 (IJ Dec. at 69). "[E]ven if he has," the IJ continued, "there are so many inconsistencies with respect to the development of his story . . . that the respondent has not demonstrated that he has ever suffered in the Ukraine because of any sexual orientation." *Id.* The IJ concluded that Zavada "made up each and every one of these beatings out of a plot" and that he had "filed a frivolous application." *Id.* at 116 (IJ Dec. at 72).

Zavada appealed to the BIA and, on September 26, 2014, the BIA affirmed the IJ's denial of Zavada's application but reversed the IJ's finding of frivolousness. *Id.* at 24–25 (9/26/14 BIA Op. at 1–2). The BIA found "no clear error in the Immigration Judge's finding that the respondent was not credible," citing evidence that Zavada "embellished his claim at several important stages in his removal proceedings." *Id.* at 24 (9/26/14 BIA Op. at 1). Specifically, the BIA cited the inconsistencies between Zavada's statement during his airport interview that he was "not afraid" of returning to Ukraine, his first asylum application which provided "for the first time that [Zavada] feared compulsory military service," and his later supplemental application—submitted "approximately two and [a] half years later"—which described Zavada's experience being beaten. *Id.* at 24–25 (9/26/14 BIA Op. at 1–2). The BIA reversed the IJ's frivolousness finding, however, rejecting the IJ's wholly unfounded skepticism towards Zavada's "status as a homosexual." *Id.* at 25 (9/26/14 BIA Op. at 2).

Zavada petitioned our court for review in 2014, and the Attorney General moved to remand to the BIA "for the BIA to clarify whether it evaluated the IJ's credibility finding under the proper standard." *Id.* at 17 (5/14/15 Sixth Cir. Order at 2). We granted the unopposed motion to remand on May 14, 2015. *Id.* On remand, the BIA clarified that, because Zavada submitted his initial application on October 21, 2004, the more stringent credibility standards of the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 302, did not apply. *Id.* at 3 (10/13/15 BIA Op. at 1). The BIA then evaluated Zavada's application under pre-REAL ID Act standards and dismissed Zavada's appeal. *Id.* The BIA again discussed the inconsistencies between Zavada's initial application and his later supplement and concluded that the IJ's credibility determination was not clearly erroneous. *Id.* at 4 (10/13/15 BIA Op. at 2). The BIA denied each of Zavada's claims, *see id.*, and Zavada now petitions for review.

## II. ANALYSIS

### A. Standard of Review

Where, as here, "the BIA reviews the immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). We review the IJ's decision "[t]o the extent the BIA adopted the immigration judge's reasoning." *Id.* Findings of fact are reviewed under the substantial-evidence standard. *Mostafa v. Ashcroft*, 395 F.3d 622, 624 (6th Cir. 2005). Under this standard, "findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'"

*Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (quoting 8 U.S.C. § 1252(b)(4)(B)).

"Questions of law are reviewed de novo." *Khalili*, 557 F.3d at 435.

**B. Asylum Claim**

Zavada first argues that the BIA erred in denying his claim for asylum. Under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(b)(1), the Attorney General may "grant asylum to those applicants who qualify as 'refugees.'" *Mapouya v. Gonzales*, 487 F.3d 396, 406 (6th Cir. 2007). The INA defines a "refugee" as an individual "who is unable or unwilling to return to" his or her home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The applicant bears the burden of establishing his or her status as a refugee. § 1158(b)(1)(B)(i). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration," and "[a]ccordingly, a credibility determination forms the initial consideration in an IJ's asylum claims analysis." *Mapouya*, 487 F.3d at 406.

The BIA held that the record supported the IJ's credibility determination. *See* A.R. at 3 (10/13/15 BIA Op. at 1). "[A]n adverse credibility determination is treated as a finding or conclusion of fact," and thus we review it under the substantial-evidence standard. *Mapouya*, 487 F.3d at 406. Because Zavada submitted his application for asylum on October 21, 2004, *see* A.R. at 849 (2004 Form I-589), his application is not subject to the provisions of the REAL ID Act of 2005. *See Abdurakhmanov v. Holder*, 735 F.3d 341, 345 n.3 (6th Cir. 2012). Under pre-

REAL ID Act credibility standards, "[a]n immigration judge's conclusion must be supported by specific reasons and must be based upon issues that go to the heart of the applicant's claim. In other words, if discrepancies cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility." *Id.* at 345–46 (internal quotation marks omitted).

Zavada argues that the BIA erred in its credibility determination because, on remand, the BIA failed to evaluate appropriately Zavada's credibility under the pre-REAL ID Act standards. Pet'r Br. at 8. We disagree. The BIA addressed the pre-REAL ID Act standard applicable to Zavada's claim and noted that it was "[r]econsidering only the material discrepancies in [Zavada's] testimony." A.R. at 3 (10/13/15 BIA Op. at 1). Specifically, the BIA addressed Zavada's "attempt to embellish his claim" by claiming a fear of compulsory military service in his first application; the BIA also discussed the fact that Zavada included the beatings that he experienced only in his supplemental application, filed over two years later. *See id.* at 4 (10/13/15 BIA Op. at 2). Zavada argues that this does not go to the "crux" of his asylum claim, *see* Pet'r Br. at 10, but this is incorrect. The differences between Zavada's first application and his later supplemental application and testimony "can[] be viewed as attempts by [Zavada] to enhance his claims" that he was persecuted on the basis of his sexual orientation, and these inconsistencies are thus relevant to Zavada's credibility. *See Abdurakhmanov*, 735 F.3d at 345–46 (internal quotation marks omitted). Indeed, Zavada admitted during his merits hearing that he "wouldn't serve in the army" because of the false medical records that his mother obtained. A.R.

at 303, 328 (03/23/11 H'rg Tr. at 88, 113).  Zavada testified that his first attorney included this information in his asylum application because it was "not enough" for Zavada to state only that he is gay.  *Id.* at 435 (10/19/11 H'rg Tr. at 219).  Although it is regrettable that Zavada's first attorney may have given him this advice, Zavada did not disavow any statements made in his initial application when he submitted his supplemental application over two years later with the assistance of new counsel.  Further, Zavada reviewed his asylum application at his merits hearing and swore that it was correct.  *See id.* at 265–66 (03/23/11 H'rg Tr. at 50–51).  The inconsistencies between his two applications "go to the heart of" Zavada's claim of persecution, *Abdurakhmanov*, 735 F.3d at 345, and under our deferential standard of review, we cannot say that the BIA erred in relying on these differences to determine that the record as a whole supported an adverse credibility determination.

Finally, because we uphold the BIA's credibility determination under the substantial-evidence standard, we must disagree with Zavada's argument that he has established eligibility for asylum "by way of his credible testimony."  Pet'r Br. at 15.  Accordingly, the BIA did not err in denying Zavada's asylum claim.

## C.  Withholding of Removal and Protection under CAT

Zavada also contends that he is entitled to withholding of removal and protection under CAT.  Pet'r Br. at 16.  In order to be entitled to withholding of removal under the INA, 8 U.S.C. § 1231(b)(3), an applicant "must show that it is 'more likely than not' that he would be subject to persecution" on the basis of a protected ground.  *Shkulaku-Purballori v. Mukasey*, 514 F.3d 499,

503 (6th Cir. 2007) (quoting 8 C.F.R. § 1208.16(b)(2)). "An applicant seeking withholding of removal faces a more stringent burden than what is required on a claim for asylum." *Pilica v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004). "Because substantial evidence supports the Board's determination that [Zavada] is ineligible for asylum, it therefore follows that [Zavada] cannot satisfy the more stringent standard for withholding of [removal]." *Koliada v. INS*, 259 F.3d 482, 489 (6th Cir. 2001).

Lastly, to establish withholding of removal under CAT, the applicant must establish that "'it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Shkulaku-Purballori*, 514 F.3d at 503 (quoting 8 C.F.R. § 1208.16(c)(2)). Because Zavada's testimony was not found credible, and because Zavada has failed to present additional evidence that establishes that "it is more likely than not that [Zavada] would be tortured if removed" to the Ukraine, 8 C.F.R. § 1208.16(c)(2), Zavada has failed to satisfy his burden under CAT. *See El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009). The BIA accordingly did not err in denying Zavada's claims.

## III. CONCLUSION

For the foregoing reasons, we **DENY** Zavada's petition for review.