NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0414n.06

No. 19-3477

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 17, 2020
DEBORAH S. HUNT, Clerk

ERNESTO GONZALEZ-HERNANDEZ, )
                                               )
        **Petitioner,**                        )        ON PETITION FOR REVIEW
                                               )        OF AN ORDER OF THE
v.                                             )        BOARD OF IMMIGRATION
                                               )        APPEALS
WILLIAM P. BARR, Attorney General,             )
                                               )
        **Respondent.**                        )        **OPINION**

Before:  MOORE, CLAY, and MURPHY, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.**  Ernesto Gonzalez-Hernandez petitions for review of the decision of the Board of Immigration Appeals ("BIA") denying his applications for withholding of removal and relief under the Convention Against Torture.  Because Gonzalez-Hernandez fails to address various bases upon which the IJ and BIA denied his applications, we **DENY** the petition for review.

## I.  BACKGROUND

Gonzalez-Hernandez is a native and citizen of Mexico.  Administrative Record ("A.R.") at 458 (Notice to Appear).  He entered the United States in April 2006, *id.* at 407 (I-589 Appl. at 1), and was not admitted or paroled after inspection by an Immigration Officer, *id.* at 458 (Notice to Appear).  After being served with a notice to appear, *id.*, and conceding its removability charge, *id.* at 120 (Hr'g Tr. at 6), Gonzalez-Hernandez appeared before an immigration judge for removal

proceedings on December 19, 2017, and submitted an application for relief from deportation, *id.* at 416 (I-589 Appl. at 10). The IJ treated this application as an application for withholding of removal and relief under the Convention Against Torture (CAT). *Id.* at 121 (Hr'g Tr. at 7).

## A. Gonzalez-Hernandez's Removal Proceedings

Gonzalez-Hernandez testified in support of his applications for relief to the following information.[1] In 2002, he was preparing to cross the border from Mexico to the United States when two individuals intercepted him and asked him to take a package across the border. *Id.* at 137–38. These individuals, unknown to Gonzalez-Hernandez, carried firearms and threatened him, but he refused and crossed the border without further incident. *Id.* at 139. He spent the day shopping in Brownsville, Texas, and returned to Mexico the same day. *Id.* at 140. Several months later, Gonzalez-Hernandez again crossed the border into the United States, this time without encountering anyone along the way. *Id.* at 145. In 2003, he prepared to cross the border again, but was intercepted by three individuals he did not know, two of whom carried firearms. *Id.* at 146–47. The individuals demanded that he take a package to the United States for them, but again Gonzalez-Hernandez refused, and he crossed safely into the United States, where he spent the day and then returned to Mexico. *Id.* at 147–48. On each of these trips, Gonzalez-Hernandez crossed into the United States lawfully with a visa. *Id.* at 149. He believed that the individuals who had stopped him and threatened to kill him were members of the Zetas, because they "are the only criminal group that operate[s] in that region." *Id.* at 149–50.

In 2004, Gonzalez-Hernandez received a tourist permit and returned to the United States. *Id.* at 152–53. This time, he decided to stay in the United States, he said, "because of the problems

---

[1]Gonzalez-Hernandez testified in Spanish through an official interpreter. A.R. at 126 (Hr'g Tr.) (Cover Page).

that I had — I have had in Mexico." *Id.* at 153. (These "problems," he confirmed, were the two encounters at the border about which he had just testified—after 2003, he had no problems in Mexico. *Id.*; *id.* at 156–58.) He remained in the United States until 2006, when he was detained in "Fort Huron," Michigan, and removed to Mexico. *Id.* at 154–55. Shortly thereafter, he returned to the United States, this time entering without inspection. *Id.* at 156. Since then, his only run-in with the law has been a charge for driving while impaired in June 2007, leading to a 12-month probation, which he completed. *Id.* at 179–81.

When asked to describe any threats, harm, or mistreatment that his friends or family have experienced in Mexico, Gonzalez-Hernandez gave four examples. First, he described a series of threatening, anonymous phone calls that his sister had received asking for information about him. *Id.* at 159–61. His sister tried to identify the callers without success. *Id.* at 161. Gonzalez-Hernandez did not state when these calls occurred, but testified that his sister, who "didn't want to tell [him] the truth," *id.* at 162, ultimately told him about the calls in 2008, *id.* at 164. His sister did not report the calls to the police because of corruption within the police force and because she did not have a phone number to report. *Id.* at 166–67.

Second, Gonzalez-Hernandez testified that in 2012 or 2013, his friend Adolfo was deported to Mexico, and was abducted four or five months after his deportation. *Id.* at 167–68. Gonzalez-Hernandez did not know who had abducted his friend, but testified that because Adolfo was unable to pay ransom, he was killed. *Id.* at 168–69. He learned of Adolfo's killing through a mutual friend and through Adolfo's wife. *Id.* at 171.

Third, Gonzalez-Hernandez described how his nephew, Juan Pablo Gonzalez, was forced to work for organized crime groups after the nephew's family was threatened. *Id.* at 172. The threats were not made to any specific person in the family. *Id.* at 193. He learned that his nephew

had been forced into this work from Gonzalez-Hernandez's sister, the same sister who had previously received the threatening calls asking about Gonzalez-Hernandez. *Id.* at 173. Some time after the nephew joined these groups, "the marines or the soldiers in Mexico detained him." *Id.* at 172–73. While detained, the nephew was beaten by his captors so that he would give information relating to organized crime. *Id.* at 173–74. Whereas the nephew's friends, who had also been detained, were taken to jail, the nephew was released from detention. *Id.* at 174. A week later, Gonzalez-Hernandez testified, the nephew was kidnapped "right around the corner from where we used to live," and has not been heard from since 2013. *Id.* at 173–75. Gonzalez-Hernandez stated that he learned this information from his sister and his brother, the nephew's father. *Id.* at 175.

Fourth, Gonzalez-Hernandez's brother, Juan, has been charged money so that the organized crime groups do not harm him. *Id.* at 194. His brother began making these extortion payments before his son (Gonzalez-Hernandez's nephew) was kidnapped. *Id.* at 194–95. Gonzalez-Hernandez speculated that his brother began paying in 2012 or 2013. *Id.* at 195.

Gonzalez-Hernandez testified that if he is deported to Mexico, "they will harm me . . . [b]ecause that criminal group continues in the same region." *Id.* at 177. He was unsure of whether he would be able to find another safe place to live in Mexico because "crime is all over the place over there." *Id.* At the removal proceedings, he proffered the testimony of his U.S. citizen brother who could corroborate his testimony, *id.* at 182, 196, and presented to the IJ a letter from his family requesting that Gonzalez-Hernandez be permitted to remain in the United States "for security reasons," *id.* at 190. The letter described the detention, release, and kidnapping of Gonzalez-Hernandez's nephew, and stated that "[f]or this reason, we beg you please not send [Gonzalez-Hernandez] back to Mexico." *Id.* at 191.

**B. Decisions by the IJ and BIA**

The IJ denied Gonzalez-Hernandez's application for relief in an oral decision. *Id.* at 94 (IJ Decision at 13). After recounting the details of Gonzalez-Hernandez's testimony, the IJ concluded first that Gonzalez-Hernandez was "generally credible." *Id.* at 88. With respect to his withholding application, the IJ stated that Gonzalez-Hernandez's application was based on alleged persecution due to his membership in three particular social groups (PSGs). *Id.* at 90. First, "deportees from the U.S. who will be kidnapped and possibly tortured or killed by the Zetas based on their imputed wealth," second, "individuals who have previously refused requests from the Zetas and other drug cartels," and third, "family members of individuals who have been harmed or killed for allegedly speaking against [the Zetas]." *Id.* The IJ determined that these groups met the PSG immutability requirement. *Id.* With respect to the third group—the only one raised in Gonzalez-Hernandez's present petition—the IJ held that it "may be particular," or in other words, may meet the PSG particularity requirement. *Id.* In so holding, however, the IJ described the PSG as "family members who have been killed by organized crime," and found that there was no evidence to suggest that the nephew had in fact been killed. *Id.* The IJ next concluded that Gonzalez-Hernandez had failed to demonstrate that the PSG was socially distinct. *Id.* at 91.

In addition to failing on social-distinction grounds, Gonzalez-Hernandez was unable to demonstrate that his membership in a PSG was a reason for his persecution. *Id.* at 91. In particular, the IJ found that Gonzalez-Hernandez could not prove his membership in the group "relating to murdered family members." *Id.* The IJ also discounted Gonzalez-Hernandez's testimony regarding his encounters with individuals at the border crossing, stating that these incidents bore no apparent connection to the "two unsolved killings." *Id.* at 92. Similarly, the phone calls that his sister received "may have occurred years after respondent left for the United States." *Id.* Thus,

apart from failing to demonstrate that he suffered from persecution, he could not demonstrate that anything that had happened to him occurred on account of a statutorily protected ground. *Id.* The IJ also concluded that Gonzalez-Hernandez did not warrant CAT relief. *Id.* at 93.

The BIA affirmed in a brief decision, stating in relevant part:

> We find no clear error in the Immigration Judge's findings of fact and concur with the Immigration Judge that the respondent did not establish the required nexus between any past harm, or his fear of future harm, and his membership in a particular social group, and he is therefore ineligible for withholding of removal.

> We will also adopt and affirm the Immigration Judge's decision to deny the respondent's application for protection under the Convention Against Torture, for the reasons articulated in her decision.

*Id.* at 3–4 (BIA Decision at 1–2). Gonzalez-Hernandez timely petitioned this court for review. We have jurisdiction to review the BIA's decision pursuant to 8 U.S.C. § 1252(a)(1).

## II. STANDARD OF REVIEW

"Where, as here, the BIA reviewed the IJ's decision *de novo* and issued its own separate opinion, we review the BIA's opinion as the final agency determination." *Hassan v. Holder*, 604 F.3d 915, 924 (6th Cir. 2010). "However, to the extent the BIA adopted the immigration judge's reasoning, this court also reviews the immigration judge's decision." *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015). We "review[] both the immigration judge's and the BIA's factual findings under the substantial-evidence standard." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). "The substantial-evidence standard requires us to defer to the agency's findings of fact 'if supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Abdurakhmanov v. Holder*, 735 F.3d 341, 345 (6th Cir. 2012) (quoting *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998) (citations omitted)). "These findings 'are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Ben Hamida*

*v. Gonzales*, 478 F.3d 734, 736 (6th Cir. 2007) (quoting 8 U.S.C. § 1252(b)(4)(B)). We review questions of law de novo. *Giraldo v. Holder*, 654 F.3d 609, 611 (6th Cir. 2011).

### III. DISCUSSION

In his petition, Gonzalez-Hernandez raises three main arguments. First, he argues that the IJ mistakenly characterized one of his proposed PSGs. Second, he argues that the IJ's factual findings about the harm that befell Gonzalez-Hernandez's nephew—and by extension, the harm that befell him and the nephew's other family members—were erroneous. Third, he argues that the IJ erred in concluding that he did not experience persecution. The problem with Gonzalez-Hernandez's petition is that, even assuming that these arguments are persuasive, he fails to address the IJ's independent conclusions that his proposed PSGs were not socially distinct and that he did not suffer persecution on account of his membership in a PSG.

Each of Gonzalez-Hernandez's three main arguments deals, for the most part, with the IJ's supposed mischaracterization of what happened to the nephew. First, according to Gonzalez-Hernandez, the IJ "materially deviated from the third particular social group by narrowing it to individuals who have been **killed** by organized crime—only killed." Pet. Br. at 10. "The IJ left out harmed or disappeared by organized crime," *id.*, which was the crux of Gonzalez-Hernandez's allegation about what happened to his nephew. If this argument were both exhausted, *cf.* Resp. Br. at 16–21, and correct, then the IJ's conclusion that Gonzalez-Hernandez "ha[d] not proven his membership" in the third proposed PSG would indeed be erroneous *if* Gonzalez-Hernandez also demonstrated that the nephew had been harmed or disappeared, A.R. at 91 (IJ Decision at 10). This latter premise is the basis of Gonzalez-Hernandez's second argument—that the IJ erred in disregarding the harm that both his nephew and brother experienced. *See* Pet. Br. at 24. Thus,

accepting these two arguments as true, Gonzalez-Hernandez would have proven that he was the member of a cognizable PSG, at least with respect to the group's immutability and particularity.

Gonzalez-Hernandez's third argument is that, contrary to the IJ's determination, he personally suffered persecution through the harm that his nephew and brother experienced and through the threats he received via phone calls to his sister. *See* Pet. Br. at 28 ("In light of Sixth Circuit law, the harm to the minor child nephew is also harm to the parent and family. So, it was an egregious error for the IJ to find 'nothing happened' to Petitioner and his brother."); *id.* at 17 ("Petitioner was threatened via calls to his sister—that was also characterized as nothing."). To support his theory of persecution, Gonzalez-Hernandez cites our decision in *Abay v. Ashcroft*, 368 F.3d 634 (6th Cir. 2004), which held that an asylum applicant could base her application on her well-founded fear that her daughter would be forced to undergo female genital mutilation if deported, *id.* at 642. Taking all three arguments together, Gonzalez-Hernandez maintains that he has endured or fears persecution and that he is a member of a PSG, namely the group consisting of family members of individuals who have been harmed or killed by organized crime.

Yet even if each of these arguments were true (and administratively exhausted), Gonzalez-Hernandez's petition would still fall short for two reasons. First, he does not challenge the IJ's conclusion that none of the proposed social groups met the social-distinction requirement. For a group to be considered socially distinct, "the set of individuals with the shared characteristic [must] be 'perceived as a group by society.'" *Umaña-Ramos v. Holder*, 724 F.3d 667, 671 (6th Cir. 2013) (quoting *In re S–E–G–*, 24 I. & N. Dec. 579, 586 (BIA 2008)). "[T]he group 'cannot be defined exclusively' by the fact that its members have been subject to harm." *Kante v. Holder*, 634 F.3d 321, 327 (6th Cir. 2011) (quoting *Matter of A–M–E & J–G–U*, 24 I. & N. Dec. 69, 74 (BIA 2007)). Nowhere in Gonzalez-Hernandez's opening brief or reply brief does he explain how his third PSG

is perceived as a group by society, and upon review of the country-condition evidence that Gonzalez-Hernandez has highlighted, we do not believe the IJ's decision regarding social distinction lacked substantial evidentiary support.

Second, Gonzalez-Hernandez does not challenge the IJ's conclusion that he failed to demonstrate a nexus between the persecution he allegedly suffered and his membership in a proposed PSG. *See Guzman-Vazquez v. Barr*, 959 F.3d 253, 274 (6th Cir. 2020) ("[A]pplicants for withholding of removal under 8 U.S.C. § 1231(b)(3) must demonstrate that a protected ground was at least one reason for their persecution."). The IJ noted the considerable gaps in time between the alleged incidents of persecution in this case: In 2002 and 2003, Gonzalez-Hernandez was threatened by individuals before crossing into the United States; at some point between 2004 and 2008 (after he had already entered the United States and remained), his sister received threatening phone calls asking about his whereabouts; in 2012 or 2013, his friend Adolfo was murdered and his brother started making extortion payments to organized crime groups; and in 2013, his nephew was detained, released, and kidnapped. *See* A.R. at 91–92 (IJ Decision at 10–11). Gonzalez-Hernandez does not respond to the IJ's conclusion that these incidents were separate and unrelated. In sum, he fails to explain how at least one reason for the persecution he has suffered or will suffer is his membership in a family with a member who has been harmed or killed.

Finally, Gonzalez-Hernandez does not demonstrate how the IJ erred in denying him CAT relief. An individual qualifies for withholding of removal under the CAT if he demonstrates that "'it is more likely than not that [he] would be tortured if removed to the proposed country of removal.'" *Haider v. Holder*, 595 F.3d 276, 289 (6th Cir. 2010) (quoting 8 C.F.R. § 208.16(c)(2)). The IJ's denial of CAT relief was supported by substantial evidence. Gonzalez-Hernandez credibly testified that several years ago, his nephew was forced into a criminal organization,

detained and tortured by the Mexican military, and subsequently kidnapped and disappeared. But as discussed above, he did not adduce evidence linking these horrific harms to a likelihood that he will suffer the same fate if he is removed to Mexico.

## IV.  CONCLUSION

For the foregoing reasons, we **DENY** the petition for review.